Judgment reversed as to Counts 1 and 4; retrial ordered as to Count 3.

**Francis J. QUINN, Steam-Path Sales, Inc. and Steam-Path Services, Inc., Plaintiffs-Appellees,**

v.

**GULF AND WESTERN CORPORATION d/b/a Mal Tool and Engineering Company, Defendant-Appellant.**

**No. 467, Docket 80–7577.**

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1980.

Decided March 11, 1981.

Bourke G. Spellacy, Hartford, Conn. (Updike, Kelley & Spellacy, P. C., Elizabeth R. Collins, Hartford, Conn., of counsel), for defendant-appellant.

Thomas J. Groark, Jr., Hartford, Conn. (Day, Berry & Howard, Hartford, Conn., Josephine Marchetti, Newington, Conn., of counsel), for plaintiffs-appellees.

Before LUMBARD, NEWMAN, and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

Gulf & Western Corporation, doing business as Mal Tool and Engineering Company (Mal Tool), appeals from a judgment of $92,294.00 with interest entered in favor of Steam-Path Sales, Inc. after a jury trial in the District of Connecticut, Thomas F. Murphy, J., presiding.[1]  Steam-Path Sales is wholly owned by Francis J. Quinn who alleged in this action that Mal Tool had agreed to pay him a ten percent commission on a contract between Mal Tool and the Tennessee Valley Authority (TVA) which Quinn had helped to arrange.[2]  As we find, on the undisputed evidence, that any agreement to pay Quinn a commission fee in compensation for his services in helping to procure the TVA contract would be in violation of federal statutes and regulations and against public policy, we reverse the judgment for Steam-Path Sales and direct that the complaint for a sales commission be dismissed.

Quinn brought this diversity suit to recover for two types of services rendered in connection with a contract between Mal Tool and TVA: first, he claimed entitlement to a sales commission from Mal Tool for obtaining the contract; the other claim was for the value of quality assurance work performed by Quinn.  The contract between Mal Tool and TVA provided that Mal Tool would supply steam turbine blades to TVA, which had an immediate need for such supplies.  The jury awarded $13,900 on Quinn's claim for the value of inspection services performed.  Gulf and Western does not dispute this portion of the judgment.

In its answer to the claim for a commission on the sales price, Mal Tool raised two affirmative defenses.  First, Mal Tool claimed that any sales commission to Quinn was barred as a "contingent fee" by federal procurement statute and regulations, 41 U.S.C. § 254 and 41 C.F.R. §§ 1–1.500 *et seq.* (1979).  Second, Mal Tool claimed that federal conflict of interest laws, 18 U.S.C. §§ 202 *et seq.*, prohibited receipt of a sales commission by a "special Government employee" such as Quinn.

The evidence at trial, with few exceptions noted below, was largely undisputed.  After

---

1.  As noted below, judgment in the amount of $13,900 with interest was also entered on claims for the value of quality assurance work performed by the plaintiff.  Judgment in this amount, however, is conceded by the defendant.

2.  Except where necessary, Quinn and Steam-Path Sales, Inc. will not be distinguished in this opinion; reference will simply be made to "Quinn."  The district court made no distinction in entering its judgment simply "for the plaintiff"; Quinn and Steam-Path Sales, Inc. were treated as one throughout.

Quinn left General Electric in July of 1975, he formed Steam-Path Services, Inc., an engineering consulting and training company. Quinn first worked for TVA in 1976 and executed two personal service contracts, one from August 1976 to August 1977 and one from August 1977 to August 1978, pursuant to which he provided technical training to TVA personnel upon request.

On March 4, 1978, Charles Loney of TVA contacted Quinn by telephone and told him of TVA's immediate need for a manufacturer of stationary steam turbine blades. Quinn agreed to help. After an unsuccessful attempt to reach one manufacturer, Quinn tried to locate Frank Kundahl, vice president of sales at Mal Tool. When that effort failed, Quinn telephoned Peter Spirito, a quality control engineer at Mal Tool. Quinn told Spirito about TVA's emergency and suggested that Spirito contact Loney directly, which Spirito apparently did soon afterwards. This was Mal Tool's first contact with both TVA and Quinn.

According to Quinn, in the course of the conversation on March 4, he told Spirito that he would seek a 10% commission on the sales price of the blades. Spirito testified at trial that he did not recall any mention of a commission. The jury apparently credited Quinn on this issue as it found that there was a contract for the commission. In any event, both agreed that Quinn made no mention of Steam-Path Sales, Inc. which was not formed until some weeks later.

On March 13, Mal Tool contracted with TVA to supply turbine blades at a price in excess of one million dollars. There followed, on March 28 and in early May, at least two meetings attended by Quinn and by Mal Tool employees during which the possible future relationship of their businesses was discussed. Quinn conceded that prior to the March 28 meeting he made no mention of his intention to form a sales company.

At TVA's insistence, Quinn was retained to inspect the parts manufactured by Mal Tool prior to their shipment to TVA. Although TVA first expected to pay for Quinn's quality assurance services under the existing personal service contract with Quinn, TVA later decided that this could not be done. Thereupon, TVA instructed Mal Tool to provide for Quinn's inspection services in its quotation which it did in the amount of $13,900, liability for which Mal Tool does not contest. There is no evidence, however, that TVA knew or suspected that in addition to this amount and the amounts being paid for special consulting services, Quinn would expect a fee because TVA was to purchase products from Mal Tool at Quinn's suggestion.

Judge Murphy denied Mal Tool's motions for a directed verdict made at the conclusion of the plaintiff's proof and again at the close of the trial, as well as a motion for judgment n. o. v. Both parties submitted requests to charge regarding the defenses that Quinn was a special government employee of the TVA during the contract negotiations and that the alleged agreement for a commission would constitute a contingent fee arrangement prohibited by federal statute and regulations. Judge Murphy refused to give any charge regarding these defenses and left to the jury only the question of whether there had been an agreement to pay a commission.

■ We conclude that the district court should have dismissed the complaint in regard to the claim for a commission on the TVA contract. It is well established that a contract between private parties for a contingent fee, in violation of Federal Procurement Regulations, will not be enforced. See, e. g., Mitchell v. Flintkote Co., 185 F.2d 1008 (2d Cir. 1951), cert. denied, 341 U.S. 931, 71 S.Ct. 804, 95 L.Ed. 1361 (1951); Bradley v. American Radiator & Standard Sanitary Corp., 159 F.2d 39 (2d Cir. 1947), aff'g 6 F.R.D. 37 (S.D.N.Y.1946); Weitzel v. Brown-Neil Corp., 251 F.2d 661 (4th Cir. 1958).

41 U.S.C. § 254(a) states that negotiated government contracts

shall contain a suitable warranty . . . by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an

agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business. . . .

This requirement is implemented in the Federal Procurement Regulations, 41 C.F.R. §§ 1–1.500 *et seq.*, which contain a mandatory "Covenant Against Contingent Fees" to be included in government contracts.

██ The agreement which Quinn claimed he had made with Mal Tool was clearly an arrangement for a fee contingent upon Mal Tool's contracting with TVA. Moreover, it is also plain that Quinn did not fall within the exemption for employees or selling agents of government contractors, since he and Mal Tool had never before had any commercial dealings, and the evidence is insufficient to support an inference that Quinn's role in the sale of the turbine blades was the start of an ongoing relationship. See 41 C.F.R. §§ 1–1.504–3, 1–1.504–4, 1–1.504–5. It is undisputed that Quinn did not assume to act for any existing selling agency when he spoke to Loney about Mal Tool's supplying turbine blades to TVA. Steam-Path Sales, Inc. did not come into being until April 19, 1978, sometime after Quinn spoke with Loney and Spirito.

██ Quinn argues, however, that the statute and regulations only provide that government contractors make a warranty, and specify various penalties for the contractor's breach of such a warranty, including the government's right to rescind the contract or to recover any commission or fee. He argues that because there is no explicit statement that any commission or contingent fee arrangement is invalid, the courts are required to enforce such agreements. We disagree. Such a conclusion is contrary to the clear policy of the procurement regulations and would be inconsistent with settled precedent in this circuit and elsewhere.

██ To begin with, it is obvious from the requirement of the warranty that commission or contingent fee arrangements are contrary to federal policy. The purpose of the warranty requirement is to "protect government agencies against corrupting influences," *Mitchell, supra,* 185 F.2d at 1010. Such arrangements would present the patent threat of persons selling government influence or access to government officials. These arrangements could easily result in higher prices for government goods and services as well as contracts which would not have been awarded had all the potential contractors been afforded equal consideration. Thus, enforcement of such an agreement would be contrary to the intent of the procurement statute and regulations.

Moreover, the identical argument was raised and, for the reasons just given, rejected in prior decisions involving similar commission or contingent fee arrangements. In *Mitchell, supra, Bradley, supra,* and *Weitzel, supra,* the lack of a specific directive that such arrangements were invalid was held to be unavailing. *See also LeJohn Manufacturing Company v. Webb,* 222 F.2d 48 (D.C.Cir.1955); *E. F. Higgins, Inc. v. R. L. Pohlman Co.,* 491 S.W.2d 249 (Mo.1973). Although in most of these cases an executive order which was the predecessor of the present procurement statute and regulations was at issue, that order required an almost identical warranty to the present one. The requirement of the warranty standing alone was sufficient to demonstrate the federal policy against commission and contingency fee arrangements.

██ Quinn also argues, as did the unsuccessful plaintiffs in these cases, that to deny him recovery would permit the government contractor to profit from its own wrong in violating the warranty against contingent fees. But there can be no profit, for the government can exercise its right, under 41 C.F.R. § 1–1.503, to recover from a contractor the full amount of any contingent fee the contractor has agreed to pay in violation of its warranty. In any event, it is clearly against public policy for the courts to lend themselves to a recovery of contingent fees which are agreed to in violation of valid government

regulations, necessary to protect the government against improvident contracts, excessive costs, and the possible corruption of public officials. We therefore see no reason to depart from the consistent and well-founded body of decisions denying enforcement to commission and contingent fee arrangements.

■ Moreover, allowance of recovery in this case would also be inconsistent with the policies of federal conflict of interest regulations. Unlike the plaintiffs in earlier cases involving contingent fee arrangements, Quinn himself was employed by the government at the time of the arrangement. Thus, the agreement also runs contrary to the prohibitions against government employees' using their official positions to their private gain.

■ Under 18 U.S.C. §§ 202, 203 it is a criminal offense for a "special Government employee" of temporary or part-time status to receive compensation from a private party for services rendered in relation to a "particular matter involving a specific party or parties . . . in which he has at any time participated personally and substantially as a Government employee or as a special Government employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise. . . . " The policy reasons behind this prohibition are obvious. Quinn does not contest that he was a "special Government employee," but argues only that this is a criminal statute and that there is nothing in the statute which specifically prohibits the courts from enforcing an agreement in which a government employee receives illegal compensation.

The argument need only be stated to be refuted. A court of law will not enforce an agreement which is illegal for the parties to make. As the Supreme Court noted in almost identical circumstances, "Were we to decree the enforcement of such a contract,

we would be affirmatively sanctioning the type of infected bargain which the statute outlaws and we would be depriving the public of the protection which Congress has conferred." *United States v. Mississippi Valley Co.*, 364 U.S. 520, 563, 81 S.Ct. 294, 316, 5 L.Ed.2d 268 (1961). We see no significance in the fact that the party seeking rescission in *Mississippi Valley* was the government itself, while here the private party seeks rescission. Enforcement of the commission arrangement here would equally require the court to sanction an "infected bargain" and deny the public the protection from corruption among public officials granted by Congress.[3]

■ For the foregoing reasons, the judgment below is affirmed with respect to the claim for compensation for quality work, but reversed with directions to dismiss the complaint on the claim for recovery of a commission or contingent fee.

---

**3.** It should also be noted that the agreement runs counter to TVA's own conflict of interest regulation, 18 C.F.R. § 1300.735–31 (1980):

A special Government employee of TVA shall not use his TVA employment for a purpose

that is, or given the appearance of being, motivated by the desire for private gain for himself or another person, particularly one with whom he has family, business, or financial ties.