**A.M. KASHFI, Plaintiff,**

v.

**PHIBRO–SALOMON, INC., Defendant and Third-Party Plaintiff,**

v.

**Lazar BERESINER, Third-Party Defendant.**

**No. 83 Civ. 4358 (CHT).**

United States District Court, S.D. New York.

Feb. 13, 1986.

Barnett & Alagia, Washington, D.C., Segal & Hundley, New York City, for plaintiff; Bernard H. Barnett, William A. Carey, Paul S. Davidson, Washington, D.C., Marvin B. Segal, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Phibro-Salomon, Inc.; Mathias Mone, Stanley K. Shapiro, Barry Sautman, of counsel.

## OPINION

TENNEY, District Judge.

In this diversity action, the plaintiff, A.M. Kashfi ("Kashfi"), is seeking to recover payment for services he claims to have rendered in Iran for the defendant, Phibro-Salomon, Inc. ("Phibro"), in 1976. The plaintiff's claims are based on a letter agreement entered into by the plaintiff and Lazar Beresiner ("Beresiner"), who is a third-party defendant in this action. The plaintiff contends that Beresiner was acting on behalf of the defendant and its English subsidiary, Derby & Co. ("Derby") when he entered into the letter agreement with the plaintiff. The plaintiff is also asserting a quantum meruit claim for services rendered.

The defendant, Phibro, now moves for summary judgment pursuant to Fed.R. Civ.P. ("Rule") 56(c). Phibro argues that (1) Phibro was not a party to the contract, and therefore has no liability under the contract; (2) the corporate veil cannot be pierced in order to impose liability on Phibro; (3) the plaintiff's claim is illegal under the law of Iran; and (4) the plaintiff's claim is barred by the statute of limitations. For the reasons set forth below, the defend-

ant's motion for summary judgment is granted.

## BACKGROUND

The plaintiff, Kashfi, is an Iranian citizen currently residing in California. Phibro is incorporated in Delaware, and has its offices in New York. It is a trading and marketing organization that deals with commodities, including oil, metals, and minerals. Phibro was formerly known as the Engelhard Minerals and Chemical Corporation ("EMC").

Phibro has European subsidiaries located in England, Switzerland and Italy. Beresiner was hired by the Swiss subsidiary, Philipp Brothers A.G. ("PBAG"), and received his salary from them. Beresiner had his office at Derby's headquarters in London, and he reported to Derby's officers.

The letter agreement at issue here was written on Derby's stationery and was signed by Beresiner under Derby's name.[1] Based on the letter agreement, the plaintiff claims that the defendant owes him $24 million for the services he rendered during 1976.

The letter agreement provided that Kashfi would be paid 1% of the value of any oil that was sold as part of the oil barter transaction that was being proposed. The agreement states: "In view of the services you have rendered and will be rendering in the future in connection with the [oil barter] transaction ... [w]e herewith confirm our undertaking to pay you ... one percent of the f.o.b. invoice value of each shipment of crude oil which will be lifted by our Group under [the oil-barter] agreement."[2] The services rendered by Kashfi, and for which he is seeking compensation, consisted of arranging meetings between the defendant[3] and key officials

1. For the purposes of this motion, the defendant assumes, *arguendo*, that the letter agreement constitutes a valid contract. Nevertheless, Phibro contends that Beresiner exceeded the scope of his authority when he signed the letter agreement with Kashfi, and therefore the letter agreement is not binding on either Phibro or its subsidiaries. The Court does not reach that issue.

2. The letter agreement dated May 5, 1976 reads as follows:
   Mr. A.M. Kashfi
   243 Takht-e Jamshid
   Tehran, Iran
   Re: Purchases by the Engelhard Group of additional Iranian Crude Oil linked to the Supply and/or Finance of Major Iranian Civil and Military Development Projects and of Equipment.
   Dear Kay,
   In view of the services you have rendered and will be rendering in the future in connection with the afore-mentioned transaction which we first proposed to the Iranian Government in March this year, and have set out again in detail today to the Minister of the Imperial Court, of which you have received a copy, We herewith confirm our undertaking to pay you for consultancy and services as outlined herein, one percent of the f.o.b. invoice value of each shipment of crude oil which will be lifted by our Group under an agreement in which the proceeds will be used to finance development projects in Iran and the payment of Iranian imports of civil and/or military equipment.

Services to be rendered include but are not limited to:
   1. Consultancy concerning development projects.
   2. Consultancy concerning local finance and budget interpretation.
   3. Provision of local office facilities.
   4. Provision of local telex and telephone services.
   5. Provision of local transportation.
   6. Provision of aircraft services within Iran.
   7. Assistance in local accommodations.
   8. Assistance in protocal for visiting management teams.
   It is clearly understood and agreed between us that the payment of one percent for the above outlined services covers *all* local costs and does not involve direct payment to any third party or parties.
   It is also agreed that payments for these services will only be made 60 days after the date of each bill of lading related to the above linked transaction.
   Yours sincerely,
   DERBY & CO. LTD.
   /s/
   Lazar D. Beresiner
   Senior Consultant to the
   Engelhard Group

3. The plaintiff claims that he was acting on behalf of Phibro and/or its subsidiaries. The defendant denies that Beresiner was acting on its behalf. For simplicity, the Court refers only to the defendant, rather than the defendant and/or its subsidiaries.

of the Iranian Government in connection with the oil barter transaction.

In March of 1976, the plaintiff was contacted by Beresiner, who was attempting to arrange an oil barter transaction between the Iranian government and Phibro. According to the plaintiff, Phibro proposed to facilitate the sale of Iranian oil on behalf of Iran, and the proceeds of the oil sales would be used by Iran to purchase military equipment from the United States.

The plaintiff alleges that between March and June of 1976 he set up a series of meetings between the defendant and various "key" Iranian officials, and that he arranged to have Iranian officials forward Phibro's proposal to the Shah of Iran for his consideration and approval. The plaintiff contends that in June 1976, the Shah approved the oil barter transaction and that the agreement resulted in the sale of $2.4 billion worth of Iranian oil, the proceeds of which were used by the Iranian Government to purchase American-made military aircraft.

The defendant denies that the oil barter transaction was ever executed. The defendant moved for summary judgment in 1983 on that basis. The defendant also requested that the Court impose a stay on discovery until the motion for summary judgment was resolved, which the Court did. The motion for summary judgment was subsequently denied in a ruling from the bench, but the parties were directed to brief the issues now before the Court. Although the stay on discovery is still in effect, the Court permitted the parties to depose the plaintiff and Beresiner.

### DISCUSSION

The defendant, Phibro, argues that summary judgment should be granted (1) because it was not a party to the letter agreement, and (2) because the agreement is illegal under Iranian law and therefore is unenforceable. The Court agrees.

Summary judgment may be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c); *see*

*generally* 6 J. Moore, W. Taggart and J. Wicker, Moore's Federal Practice ¶ 56.15 [1.–0] (2d ed. 1983). The party moving for summary judgment has the burden of showing that there are no material facts in dispute, and the court will resolve all ambiguities in favor of the party opposing the motion. *See Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975).

■ If, however, the motion for summary judgment is supported by affidavits or other sworn testimony as provided by Rule 56(e), so that the moving party makes a prima facie showing that there is no genuine issue of material fact, then the nonmoving party must adduce "specific facts showing that there is a genuine issue for trial." *Id.; see Barnett v. Howaldt*, 757 F.2d 23, 26 (2d Cir.1985). Summary judgment will not be denied on the basis of mere conclusory allegations, made without factual support. *See Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

After careful consideration of the record, and having heard oral argument on this matter, the Court concludes that the defendant's motion for summary judgment must be granted.

### I. PHIBRO AS DEFENDANT

#### A. *Parties to the Contract*

The May 5th letter, upon which the plaintiff's claim is based, clearly and unambiguously sets forth Kashfi and Derby as the contracting parties. The contract gives no indication that Phibro was a party to the agreement or that Phibro intended to be a party. Nor is there any indication that either Kashfi or Beresiner, who agreed on the terms of the contract, intended to bind Phibro under the contract.

Nevertheless, the plaintiff argues that the letter agreement was not between Kashfi and Derby, but rather was between Kashfi and Phibro. Even though the agreement was written on Derby's stationery and was signed by Beresiner under Derby's name, the plaintiff claims that

Phibro was the contracting party. It is not enough, according to the plaintiff, to look at the contract itself, but rather all the circumstances surrounding it must be considered. The plaintiff argues that Phibro is a party to the contract because Beresiner was employed by Phibro and orally represented that he was signing the letter agreement on Phibro's behalf. The Court rejects this argument based on the plain language of the letter agreement.[4]

The Plaintiff contends that initially he entered into an oral agreement with Beresiner, and that the oral agreement was subsequently reduced to writing in the letter agreement of May 5, 1976. The letter agreement contains the terms agreed upon, and it appears to be a completely integrated agreement. *See* Restatement (Second) of Contracts § 209 (1981) (A letter confirming an oral agreement is a completely integrated agreement); J. Calamari & J. Perillo, Contracts § 3–2, at 102 (2d ed.1977) (A letter of confirmation generally acts as a complete integration if the other party makes no objection to its terms.) Where, as here, the parties have reduced their agreement to a writing, the parol evidence rule operates to exclude evidence of any prior or contemporaneous oral agreement which contradicts, varies, or adds to the terms of the written agreement. *See Cortlandt v. E.F. Hutton, Inc.*, 491 F.Supp. 1, 4 (S.D.N.Y.1979); *Conn Organ Corp. v. Walt Whitman Music Studios, Inc.*, 67 A.D.2d 995, 413 N.Y.S.2d 725, 727 (App. Div.1979).

■ On its face, the contract shows Kashfi and Derby to be the parties to the contract. Parol evidence cannot be introduced to contradict an essential term of the contract, *see Cortlandt v. E.F. Hutton*, 491 F.Supp. at 4, and in this instance, the identity of the parties is an essential term.

■ The agreement is written on Derby stationery. The name Derby & Co. Ltd. appears in bold capital letters in the upper left-hand corner of the stationery, and Derby's address and phone number appear in the right hand corner. The letter agreement was signed as follows: "Yours sincerely, DERBY & CO. LTD, [signature], Lazar D. Beresiner, Senior Consultant to the Engelhard Group." The signature line designates Derby as the signing party. The phrase following Beresiner's name is a descriptive phrase that identifies Beresiner. The signature clearly indicates that Beresiner was signing on behalf of Derby, not on behalf the Engelhard Group. *See In re Estate of Gagliardi*, 55 N.Y.2d 109, 114, 447 N.Y.S.2d 902, 904, 432 N.E.2d 774, 776 (1982); *Tate v. McQuade*, 83 Misc.2d 951, 962, 373 N.Y.S.2d 263, 273 (Super.Ct.1975).

The plaintiff argues that the agreement was written on Derby's stationery simply because Beresiner had an office at Derby's headquarters and the stationery was easily accessible. The plaintiff contends that writing the agreement on Derby's stationery, and signing the agreement under Derby's name, has no legal effect. This argument is also barred by the parol evidence rule since the contract is clear on its face. In any event, the argument is most unconvincing. Both Kashfi and Beresiner are, by their own description, sophisticated and experienced businessmen. Although they both worked on drafting the body of the agreement, neither elected to name Phibro as a party to the agreement within the four corners of the contract.

If the plaintiff wishes to enforce the contract, he must do so in accordance with the terms of the instrument itself. Thus, the plaintiff cannot assert a contract claim against Phibro, unless Phibro can be held liable for any obligations incurred by Derby as a result of the letter agreement. Accordingly, the Court now turns to the question of Phibro's relationship with Derby.

B. *Piercing the Corporate Veil*

■ Courts are reluctant to disregard the separate existence of related corpora-

---

**4.** It should also be noted that Kashfi has presented no evidence to support his contention that Beresiner was employed by Phibro, and the undisputed facts contradict his contention. *See* discussion *infra* concerning piercing the corporate veil, and the relationship between Phibro and Derby.

tions by piercing the corporate veil, and have consistently given substantial weight to the "presumption of separateness." *See, e.g., Crown Central Petroleum v. Cosmopolitan Shpg. Co.,* 602 F.2d 474, 477 (2d Cir.1979); *Wren Distributors, Inc. v. Phone-Mate, Inc.,* 600 F.Supp. 1576, 1579 (E.D.N.Y.1985); *Coastal States Trading, Inc. v. Zenith Nav. S.A.,* 446 F.Supp. 330, 337 (S.D.N.Y.1977). The plaintiff is seeking to pierce the corporate veil between Phibro and Derby.[5] In order to prevail, the plaintiff must successfully advance a two-step argument: the plaintiff must show (1) that Derby is a "mere instrumentality" of Phibro; and (2) that the subsidiary is being used by the parent corporation in order to commit or conceal a fraud.

To meet the first requirement, the plaintiff must show that Derby was controlled and dominated to such an extent that it had no existence of its own. To meet the second requirement, the plaintiff must show that Phibro used Derby's corporate existence to perpetrate a fraud that will result in an unjust loss to the plaintiff if the corporate veil is not pierced. *See Williams v. McAllister Bros., Inc.,* 534 F.2d 19, 21 (2d Cir.1976); *D.L. Auld Co., v. Park Electrochemical Corp.,* 553 F.Supp. 804, 805–06 (E.D.N.Y.1982); *New York State Teamsters Conf. Pens. & Ret. Fund v. Hoh,* 554 F.Supp. 519, 525 (N.D.N.Y.1982). After careful consideration, the Court concludes that the plaintiff has failed to adduce any evidence that would support piercing the corporate veil.

The Second Circuit has indicated that there are a number of factors that are appropriate for consideration in determining whether the corporate veil should be pierced, including: "(1) the absence of the formalities which are part and parcel of normal corporate existence, *i.e.,* the issuance of stock, the election of directors,

the keeping of corporate records, etc., (2) inadequate capitalization, and (3) personal use of corporate funds." *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984). The plaintiff has failed to allege that any of these factors exist in the instant case.[6]

The control exerted by the parent corporation must be extensive. It is not enough that related corporations have the same officers and directors, *see Coastal States v. Zenith,* 446 F.Supp. at 337, or that the a parent corporation owns all of its subsidiary's stock, *see Williams v. McAllister,* 534 F.2d at 21, or even that a parent and subsidiary hold themselves out as being a single integrated operation, controlled and managed from the parent's offices. *See Fidenas A.G. v. Honeywell, Inc.,* 501 F.Supp. 1029, 1035–38 (S.D.N.Y.1980). In order to pierce the corporate veil, the parent corporation must dominate the finances, policies, and business practices of the subsidiary corporation to such an extent that the subsidiary has no separate existence of its own. *See Coastal States v. Zenith,* 446 F.Supp. at 337 (citing *Fisser v. International Bank,* 282 F.2d 231, 238 (2d Cir.1960)).

The plaintiff argues that "the evidence discloses a course of joint collaborative activity among ... Phibro's New York officials and Phibro's European [subsidiaries] which would more than warrant a jury finding that Derby in this transaction was a mere instrumentality of Phibro." Plaintiff's Memo. at 13. The plaintiff also contends that summary judgment is inappropriate because there has been virtually no discovery. However, a bald allegation that a corporation exerts control over the decisions of its wholly owned subsidiary is not sufficient to sustain a claim against the

---

**5.** Derby is a wholly owned subsidiary of Phibro, and is not a party in this action. It appears that any action against Derby must be pursued in the English courts. *See* Plaintiff's Memo at 20.

**6.** Other factors deemed important include: (1) whether there are common directors or officers; (2) whether there are separate books and ac-

counts; (3) whether there are common business departments; (4) the extent to which contracts between the parent and subsidiary favor one over the other; and (5) the connection between the parent corporation and the contract giving rise to the suit. *See Miles v. American Tel. & Tel.,* 703 F.2d 193, 195–96 (5th Cir.1983).

parent corporation. *See New York State Teamsters v. Hoh,* 554 F.Supp at 525; *Posner v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.Supp. 972, 985 (S.D.N.Y. 1979). Further, "collaborative activity" between related corporations, without more, does not present adequate grounds for piercing the corporate veil.

Despite the limit imposed on discovery in the instant case, the plaintiff has submitted considerable documentary evidence—primarily letters and internal memoranda from Phibro and its subsidiaries—which the plaintiff claims demonstrates the control exercised by Phibro over Derby.[7] Specifically, the plaintiff has identified the following factors as indicating control: "(1) Beresiner's relationship to Phibro, (2) the involvement of Phibro's key New York officials, and (3) the lack of activity by Derby and its subservience to Phibro." None of the evidence submitted, however, supports an inference that the degree of control exercised by Phibro was sufficient to disregard the corporate entity.

■ The undisputed facts show that Beresiner was hired by Phibro's Swiss subsidiary, PBAG, and Beresiner's Employment Agreement was signed by PBAG's managing director. PBAG also paid Beresiner's salary. Beresiner had an office at Derby's headquarters in London, and reported to Derby's officers. The plaintiff states that "Beresiner's authority to pay the money necessary to employ plaintiff came at a February 1976 meeting with Phibro's European management," which consisted of representatives from Phibro's European subsidiaries. *See* Plaintiff's Memo. in Opposition at 14. The plaintiff's argument that Beresiner was employed by Phibro has no merit in light of these undisputed facts.

In order to show the control exerted by Phibro over Derby, and over this transaction in particular, the plaintiff points out that Beresiner's Employment Agreement was subject to approval by Phibro, and that Beresiner met with Phibro executives in New York. It should be noted, however, that Beresiner's Employment Agreement was not negotiated by Phibro nor was it finalized at the meeting in New York. Rather, the Employment Agreement was finalized after Beresiner met with the European Management Group. *See* Beresiner Aff. at 3. The plaintiff also points to the fact that Beresiner's Iranian oil assignment originated with David Tendler ("Tendler"), a Phibro executive, and that Beresiner sent a number of letters or memoranda to New York in order to keep Phibro advised of his progress.[8]

In May of 1976 there was a European Convention, in England, which was attended by the managing directors of Phibro and its subsidiaries. According to Beresiner, he told Tendler at that conference about the contract with the plaintiff. Beresiner testified that he discussed the Iranian oil transaction with Tendler, as well as with individuals from the European Management group, and that Tendler told him to try to conclude the oil transaction.

■ The picture that emerges from this set of facts is not one of domination and control, but rather one of a group of related companies, in different countries, working closely together. Moreover, the plaintiff admits as undisputed fact that: (1) Derby is incorporated under British law; (2) Derby has a separate board of directors; (3) Derby has its own bank account; and (4)

---

7. The plaintiff also had the opportunity to depose Beresiner, who had regular contact with both Derby and Phibro. It is interesting to note that at his deposition, Beresiner indicated that he has a financial interest in the outcome of this lawsuit. He testified that, in 1979, he and the plaintiff entered into a written agreement, which provides that the plaintiff will give Beresiner 10% of any money he receives if the suit is settled, or 3% of any award he receives if the case goes to trial. Beresiner Dep. at 212–13.

8. The defendant has submitted the affidavits of Tendler and Ludwig Jesselson, Phibro executives, to whom a number of Beresiner's communications were addressed. Both acknowledge that Phibro received reports concerning Beresiner's activities, but they both essentially contend that the reports were "for information purposes only," and that Beresiner was not acting "in any capacity for Phibro." Jesselson Aff. at 2.

Derby has its own credit standing. *See* Plaintiff's Rule 3(g) Statement. In addition, the defendant has submitted affidavits stating that Derby maintains separate offices, is separately managed, and its business affairs are conducted independently. The plaintiff has failed to submit any evidence controverting these statements.

Furthermore, the test for piercing the corporate veil also requires a showing that the dominated corporation was used to commit a fraud. *See Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 903 (2d Cir.1981); *Williams v. McAllister,* 534 F.2d at 21. There must be a showing of bad faith or fraud, in order to overcome the presumption of separateness. *See Wren v. Phone-Mate,* 600 F.Supp. at 1579. Thus, for a viable claim to exist, the plaintiff must adduce some evidence of fraud, to justify piercing the corporate veil. *See New York State Teamsters v. Hoh,* 554 F.Supp. at 525.

In the case at bar, the plaintiff has made no attempt to show that Phibro was using Derby to commit fraud, or that the plaintiff would suffer an unjust loss if he brought an action against Derby, rather than against Phibro.[9] The plaintiff has had ample opportunity to raise the issue of fraud; he submitted a complaint and an amended complaint, he submitted several affidavits, and he was deposed. At no point did he allege that there was fraud, nor does the record reveal that there would be any basis for such an allegation.

Viewing the evidence in the light most favorable to the plaintiff as the nonmoving party, the Court concludes that the evidence presented by the plaintiff—when considered in conjunction with the undisputed facts, and absent any indication of fraud—is insufficient as a matter of law to support a claim against Phibro under the

doctrine of piercing the corporate veil. *See Noto v. Cia Secula di Armanento,* 310 F.Supp. 639, 647 (S.D.N.Y.1970) ("Where, as here, the solvency of the subsidiaries is unquestioned, where the outward indicia of corporate form have been carefully maintained, and where the corporate form has not been used to defraud, there is no equitable reason whatsoever to pierce the corporate veil.").

### C. *Agency*

The plaintiff also contends that Derby was acting as an agent for Phibro, and therefore Phibro is bound by the contract at issue here. This argument, however, does not help the plaintiff. The test for determining whether a corporation is acting as an agent for a related corporation is the same as the test imposed under the doctrine of piercing the corporate veil. *See Fidenas AG. v. Honeywell Inc.,* 501 F.Supp. at 1037.

Applying a different standard would undermine the strong policy that exists concerning the presumption of separateness and respecting the corporate entity. Thus, the plaintiff's argument that when Derby signed the letter agreement, Derby was acting as Phibro's agent, fails for the reasons discussed above.

In sum, the Court concludes that summary judgment is appropriate since Phibro was not a party to the contract, the doctrine of piercing the corporate veil is not applicable, and Derby was not acting as an agent for Phibro. Although the question of corporate control is a question of fact that should ordinarily be submitted to the factfinder, summary judgment is appropriate in a case such as this, where the evidence discloses no real question of fact.[10] *See Luckett v. Bethlehem*

---

**9.** The plaintiff does contend that it would be unjust to dismiss the case, because he would then have to commence an action in an English court in order to obtain relief. Clearly, that result cannot be considered inequitable.

**10.** The plaintiff argues that summary judgment cannot be granted because only very limited

discovery has been permitted. The plaintiff, however, has failed to show how he would benefit from further discovery, and the Court cannot ascertain any meritorious benefit to the plaintiff.

Because the contract is unambiguous and the parol evidence rule applies, further discovery concerning the contract itself, or the parties'

*Steel Corp.*, 618 F.2d 1373, 1379 (10th Cir. 1980); *Fidenas AG v. Honeywell Inc.*, 501 F.Supp. at 1037; *accord Solargen Electric Motor Car Corp. v. American Motors Corp.*, 530 F.Supp. 22, 26 (S.D.N.Y.1981), *aff'd*, 697 F.2d 297 (2d Cir.1982) ("[L]itigants' rights to trial on their claims should not be extended 'to the point of requiring ... [a] trial notwithstanding the absence of any significant probative evidence tending to support the complaint.'" *quoting First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

### D. Quantum Meruit

The plaintiff also asserts a *quantum meruit* claim for a finder's fee.[11] The plaintiff argues that he is entitled to a finder's fee for having introduced the defendant to Iranian officials who had the authority to approve the defendant's proposed oil barter transaction. The *quantum meruit* claim, however, is barred by the statute of limitations.

■■■ Because this is a diversity case, New York's statute of limitations applies. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 112, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The plaintiff's claim is governed by N.Y. CPLR § 213(2) (McKinney 1972), which provides that an "action upon a contractual obligation or liability, express or implied," must be commenced within six years.

■■■ The services which provide the basis for the plaintiff's claim were performed in 1976. The plaintiff did not commence this action until 1983, seven years later. The plaintiff's cause of action for a finder's fee accrued in 1976, at the time that he rendered the services. *See Geller v. New England Inds., Inc.*, 535 F.2d 1381, 1385 (2d Cir.1976). Accordingly the plaintiff's *quantum meruit* claim is time barred, and the defendant's motion to dismiss that claim is granted.[12]

In light of the disposition of the defendant's motion for summary judgment, the Court does not address the question of whether the plaintiff's contract claim is also barred by the statute of limitations.[13]

## II. ILLEGALITY

Summary judgment is also appropriate in this case because the contract sued on contravenes Iranian law and is therefore unenforceable. The doctrine of illegality provides a separate and independant basis for dismissing the plaintiff's complaint.

In general, a contract to commit an unlawful act is wholly unenforceable. *See Bankers Trust Co. v. Litton Systems, Inc.*,

---

intentions, would be pointless. Moreover, the two individuals who drafted and signed the agreement—Beresiner and Kashfi—have both been deposed. Even so, the plaintiff has failed to plead any material facts that raise an issue for trial.

It would also be senseless to permit further discovery in relation to the issues of piercing the corporate veil and agency. The undisputed facts show that Derby operates as an independant entity, and the plaintiff does not even allege that Derby is being operated as a shell corporation to provide a front for fraudulent activities on the part of Phibro. Thus, permitting further discovery on this issue would be unjustified.

In terms of the *quantum meruit* claim, discovery is not needed since the plaintiff himself is fully cognizant of all the facts concerning when and where he performed the services for which he is seeking compensation. And, finally, the question of whether the contract is legal under Iranian law is a question of law. The record before the Court is sufficient to determine the legality of the agreement. Thus, the defendant's motion for summary judgment should not be denied merely because the plaintiff has not been permitted to conduct discovery.

**11.** The plaintiff asserts this claim as an alternative to his contract claim since a *quantum meruit* claim cannot be asserted if there is a valid contract. *See Fox v. Lummus Co.*, 524 F.Supp. 27, 30 (S.D.N.Y.1981).

**12.** In addition, the plaintiff has agreed to the dismissal of his third cause of action, tortious interference, and his fourth cause of action, fraudulent misrepresentation. *See* Plaintiff's Memorandum in Opposition at p. 2 n. 1. Accordingly, the Court hereby dismisses those claims.

**13.** The defendant has further moved to dismiss the complaint on the grounds of *forum non conveniens*. It is not necessary to address that motion, in light of this opinion.

599 F.2d 488, 492 (2d Cir.1979); *Nathan v. Tenna Corp.*, 560 F.2d 761, 765 (7th Cir. 1977); *Colyvas v. Redhand Compositions Co., Inc.*, 318 F.Supp. 1376, 1377 (S.D.N.Y. 1970). A party to an illegal contract cannot ask a court of law to help him enforce that contract. *See Comdisco, Inc. v. United States*, 756 F.2d 569, 576 (7th Cir.1985); *Anabas Export Ltd v. Alper Indus. Inc.*, 603 F.Supp. 1275, 1276 (S.D.N.Y.1985). Relief is denied to such a plaintiff, not because the court favors the defendant, but rather because the court will not aid a party whose claim arises out of his own immoral or illegal act. *See* Restatement of Contracts, § 598, Comment (a); E. Farnsworth, Contracts, §§ 5.5–.6 (1982).

■■■■■■ The legality of a contract is ordinarily determined in accordance with the law of the place where the contract is performed. *See* Restatement (Second) of Conflicts of Laws § 202 at 645 (1971); 6A A. Corbin, Corbin on Contracts § 1374 at 9 (1962); *see also Louis Schlesinger Co. v. Kresge Foundation*, 312 F.Supp. 1011, 1028 (D.N.J.1970). In the case at bar, it is undisputed that performance was rendered in Iran. Iranian law, therefore, is controlling.

■■■ Disputes concerning the meaning of a foreign statute raise questions of law, rather than questions of fact. *See* Fed.R. Civ.P. 44.1. Summary judgment, therefore, is not precluded simply because foreign law is applicable. *See Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir. 1970); *Alosio v. Iranian Shipping Lines, S.A.*, 426 F.Supp. 687, 689 (S.D.N.Y.1976), *aff'd mem.*, 573 F.2d 1287 (2d Cir.1977); *Instituto Per Lo Sviluppo Economico v. Sperti Products, Inc.*, 323 F.Supp. 630, 635 (S.D.N.Y.1971). It is clearly within the authority of the court to interpret and apply a foreign statute. *See Curtis v. Beatrice Foods Co.*, 481 F.Supp. 1275, 1285 (S.D.N.Y.), *aff'd mem.*, 633 F.2d 203 (2d Cir.1980);

9 C. Wright & A. Miller, Federal Practice & Procedure § 2444 at 406–07 (1971).

■■■ In the case at bar, the Court concludes that the contract is unenforceable because it violates Iran's penal statute—the Law for the Punishment of the Use of Influence Contrary to Justice and Legal Provisions, enacted in 1936 (the "Influence Law"). Articles One and Two of the Influence Law essentially prohibit an individual from being paid to exercise his good standing or influence with a public official. Article One provides in relevant part:

> Any person, who on a representation of his good standing or influence with any employee of the government, a municipality, the civil servants or persons appointed to the service of the public, receives any amount in cash or ... accepts any promise ... as a consideration for exercising his influence with the said officials shall ... be sentenced to imprisonment[.]

Article Two provides in relevant part:

> Any person, who misuses a personal relationship which he has with the officials or employees described in Article 1 and, contrary to justice and the provisions of law, exercises influence for the benefit or harm of another person in relation to official matters committed to them, shall be sentenced to imprisonment[.][14]

The plaintiff states that the services he rendered consisted of (1) introducing Phibro's representatives to key Iranian officials; (2) arranging meetings between Phibro representatives and Iranian officials; and (3) recommending Phibro's proposal to appropriate officials by vouching for the defendant's reliability. Essentially, the plaintiff is seeking to be paid for having used his personal and political contacts for the defendant's benefit, which is precisely the type of conduct that is prohibited by the Iranian Influence Law.[15]

**14.** The text of Articles One and Two set forth herein is based on the translation provided by the plaintiff. Although there is a slight difference in the wording between the plaintiff's translation and the defendant's, the essence of the statute is the same and the conclusions set forth below are not affected.

**15.** Kashfi testified at his deposition that he was a member of the Iranian Parliament at the time he was engaged by Beresiner. Based on that

The plaintiff himself admits that he is seeking compensation for exercising his influence.[16] In his amended complaint, the plaintiff states that Beresiner wanted him to "use his contacts and influence in Iran to obtain meetings with ... key cabinet members and the Shah of Iran himself, in order to present defendant's proposals," Amended Complaint at ¶ 8. The amended complaint also indicates that Kashfi agreed to do so, and that he was, in fact, hired for that specific purpose.[17] Id. at ¶¶ 8–9.

In this 3(g) Statement, the plaintiff declares that he was an intimate friend of Alam, the Minister of the Imperial Court, and admits as an undisputed fact that Alam facilitated business for him with the government of Iran based on the personal relationship between the plaintiff and Alam. See Plaintiff's 3(g) Statement at pg. 2. The plaintiff also admits that he agreed to assist Phibro by exercising "his personal influence with [various] high-ranking government officials to introduce defendant's representatives to those government officials and to procure Alam's assistance in presenting and recommending the proposed barter transaction to the Shah of Iran." Id. Furthermore, in briefing his argument, the plaintiff describes his agreement with Beresiner as follows: "Beresiner agreed that in return for the plaintiff's use of his considerable contacts and influence, Phibro would pay plaintiff 1% of the value of any Iranian oil handled by Phibro in connection with the oil proposal." (Emphasis added).

At his deposition, the plaintiff made the following statements concerning the legality of his conduct:

> Q. I understand that your testimony is that you, in fact, made these introductions [of Beresiner to government officials]?
>
> A. Yes.

---

testimony, the defendant claims that the contract is also illegal under the Iranian penal statute—the Law Prohibiting the Involvement of ... Members of the Two Houses of Parliament ... in Governmental and National Transactions ("Members of Parliament Law"). That statute prohibits Parliament members from receiving compensation for participating in transactions involving the Iranian government.

In a subsequent affidavit, Kashfi states that his testimony concerning his term in Parliament was incorrect, and that he had been a member of parliament from 1971 to 1975, but was not a member in 1976 when he was retained by Beresiner. For the purposes of this motion, it is immaterial whether the plaintiff was a member of Parliament or a private citizen. Since the Court concludes that the contract is illegal under the Iranian Influence law, it is not necessary to determine whether it also violates the Members of Parliament Law.

In addition, Beresiner testified at his deposition that part of the money that was to be paid to Kashfi pursuant to the Letter Agreement was to be used to bribe Iranian officials. See Beresiner's Dep. at 220. Kashfi denied this allegation. See Kashfi's Dep. at 161. While Beresiner's testimony may be persuasive, the Court does not rely on it. Kashfi's own sworn statements, together with other portions of Beresiner's deposition, the documentary evidence submitted, and the circumstances surrounding the contract, provide ample evidence that the contract was unlawful under the Influence Law. There is no need to determine whether the parties had agreed that a portion of the money would be used to bribe Iranian officials.

16. Although the contract does not—on its face—violate Iranian law, it is still unenforceable. The words of a contract need not disclose the illegality, as long as the contract "is closely connected with an unlawful action." Contemporary Mission, Inc. v. Bonded Mailings, Inc., 671 F.2d 81, 83 (2d Cir.1982); see Anabas v. Alper, 603 F.Supp. at 1278; Colyvas v. Red Hand, 318 F.Supp. at 1377. In the instant case, the letter agreement merely states that a fee will be paid to the plaintiff for services rendered in the past and future. It is evident that the contract is closely connected to an unlawful action since the services rendered by the plaintiff involved the improper use of his personal influence. This conclusion is supported by the documentary evidence, and the plaintiff's admissions and deposition testimony.

17. The Influence Law prohibits an individual from receiving payment based "on a representation of his good standing or influence" with a government official. Kashfi argues that he never made an express representation concerning his good standing or influence. Kashfi readily admits, however, that Beresiner knew that Kashfi could exert influence with certain Iranian officials, and that Beresiner sought Kashfi out and hired him because of Kashfi's influence and good standing. That is sufficient to meet the "representation" element of the Influence Law.

Q. And I gather your testimony is that it was those introductions that entitle you to the fee?

A. Yes.

Q. Now, why does the letter not recite that making those introductions was part of your job?

\* \* \* \* \* \*

Q. I see no reference in [the purported letter] agreement, in the description of the services which you were to perform, to any services concerning your making introductions?

A. I cannot do it, Mr. Mone. I condemn myself if I do such a thing, according to the law of Iran.

Q. You cannot put it down?

A. Of course I cannot do it. I'm no fool." [18]

Kashfi Dep. at 154–55.

Thus, the plaintiff's own statements concerning the services he rendered make it clear that the contract is illegal under the Influence Law, and is therefore unenforceable.

█ The letter agreement at issue here also contravenes the public policy of the United States. Exercising personal or political influence with government officials in order to obtain a government contract is expressly prohibited by 41 U.S.C. § 254(a) (the "Procurement Statute"). *See Quinn*

*v. Gulf & Western Corp.*, 644 F.2d 89, 93 (2d Cir.1981); *accord Racquet Club, Inc. v. Lipper*, 373 F.2d 753, 754 (1st Cir.1967) ("[C]ourts will decline to enforce contingent fee contracts when an attempt to introduce personal solicitation and personal influence into dealings with government is actually intended or in fact results."); 6A A. Corbin, Corbin on Contracts § 1447 at 495–96 (1962) ("If part of the services bargained for consist in the exercise of personal or political influence on legislators or officials, made effective by personal solicitation, it is clear that the bargain is unlawful.").[19]

The federal Procurement Statute prohibits paying a commissioned fee to an individual for arranging a contract between the United States government and a third party.[20] In *Quinn v. Gulf & Western*, the defendant agreed to pay the plaintiff a commissioned fee for his services in procuring a government contract, and the parties signed an agreement to that effect. The Second Circuit refused to enforce the parties' agreement because it violated the federal Procurement Statute. The court also noted that enforcing the contract would undermine the public policy of protecting government officials against corrupting influences. 644 F.2d at 93.

Obviously the letter agreement in the instant case is not invalidated by the feder-

18. The plaintiff subsequently testified that the agreement was legal because he was hired to act as a consultant, and acting as a consultant is legal in Iran. The Court will not disregard the other testimony and evidence concerning the legality of the agreement, however, simply because the plaintiff asserts that the contract is legal.

19. In arguing that the contract is legal, the plaintiff relies on *Industries, Investments & Agencies (Bahamas) Ltd. v. Panelfab Int'l Corp.*, 529 F.2d 1203 (5th Cir.1976). In that case, the court held that it is lawful for an individual "to contract to use his influence of personal connections merely to gain access to a public official or even to urge an official to favor his client's proposal, as long as the persuasion is made on the merits of the proposal and not on any other basis." *Id.* at 1213.

In the case at bar, the Court must apply the law of Iran, and the Iranian Influence Law

would prohibit a contract such as the one described in *Panelfab*. Moreover, the federal Procurement Statute would also prohibit such a contract, if the parties were attempting to secure a government contract. Thus the plaintiff's reliance on the *Panelfab* case is misplaced.

20. The Procurement Statute provides in relevant part that negotiated government contracts:

shall contain a suitable warranty ... by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee[.]

41 U.S.C. § 254(a). *See also Oscanyan v. Arms Co.*, 13 Otto 261, 103 U.S. 261, 273, 26 L.Ed. 539 (1880) ("Personal influence to be exercised over an officer of government in the procurement of contracts ... is not a vendible article in our system of laws and morals[.]").

al Procurement Statute, since the United States government was not involved. However, Kashfi is seeking compensation for the efforts he expended in attempting to secure a contract for the defendant with the government of Iran, which is exactly the kind of practice that Congress condemned when it enacted the Procurement Statute in this country.

The Iranian Influence law is similar to the federal Procurement Statute, and—based on the plain language of the Influence Law—it appears that the objectives of both laws are the same. The purpose of the Procurement Statute is threefold: (1) to prevent the use of improper influence in connection with securing government contracts; (2) to eliminate arrangements which encourage inequitable and exorbitant fees that bear no reasonable relationship to the services rendered; and (3) to prevent contracts being awarded on a basis other than merit. *See* 41 C.F.R. § 1–1.500 (1984); *see also Quinn v. Gulf & Western,* 644 F.2d at 93 ("[Contingent fee] arrangements could easily result in higher prices for government goods and services as well as contracts which would not have been awarded had all the potential contractors been afforded equal consideration.") These objectives can also be ascribed to the Iranian Influence Law.[21] In order to enforce the Letter Agreement in this case, the Court would essentially have to disregard these objectives. Thus, for the reasons set forth above, the Court concludes that the letter agreement is unenforceable.

## CONCLUSION

The defendant's motion for summary judgment is granted. The plaintiff failed to adduce any evidence showing that Phibro's corporate entity should be disregarded or that Phibro was a party to the contract. The plaintiff's quantum meruit claim is barred by the statute of limitations. Further, the doctrine of illegality provides an

independent basis for dismissing the plaintiff's complaint.

So Ordered.

---

**21.** It is interesting to note in the instant case that the plaintiff is seeking $24 million, a fee which on its face appears to bear little relationship to the value of the services actually performed. Moreover, the plaintiff stated in his

3(g) Statement that Alam facilitated business for him based on their friendship, which essentially undermines the policy of awarding a contract based on merit rather than personal contacts.