**WREN DISTRIBUTORS, INC. and Innovative Marketing Concepts, Inc., Plaintiffs,**

**v.**

**PHONE–MATE, INC., Defendant.**

**No. 83 Civ. 4810.**

United States District Court, E.D. New York.

Jan. 28, 1985.

Zissu, Berman, Halper, Barron & Gumbinger, New York City, for plaintiffs.

O'Melveny & Myers, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

This is a diversity action brought by Wren Distributors, Inc. ("Wren") and a related company, Innovative Marketing Concepts, Inc. ("IMC"), which arises out of business transactions between plaintiffs and defendant Phone-Mate, Inc. ("Phone-Mate"). Phone-Mate has moved this Court for an order compelling plaintiffs to arbitrate this action pursuant to 9 U.S.C. § 4,[1] and/or to stay this action pending arbitration pursuant to 9 U.S.C. § 3.[2] Since the filing of this motion, IMC has consented to arbitrate its claims against Phone-Mate, and to stay its claims in this Court pending arbitration. Therefore, the only questions remaining before me are whether Wren can be compelled to arbitrate its claims against defendant, and if not, whether Wren's claims against defendant may be stayed pending arbitration of IMC's claims against defendant. For the reasons set forth below, Phone-Mate's motion to compel Wren to arbitrate its claims is denied, as is Phone-Mate's request that Wren's claims in this case be stayed pending completion of the IMC/Phone-Mate arbitration.

*Facts*

Defendant Phone-Mate is a California corporation which designs, engineers and markets various telecommunications products throughout the United States for use in homes and in small businesses. In addition to its own personnel, defendant utilizes firms which act as distributors of its products as well as separate manufacturer representative firms ("sales reps" or "reps") to carry out its business. As detailed in both plaintiffs' and defendant's motion papers, the functions and methods of operation of the distributor and sales rep differ considerably.[3]

The sales rep, who is active in the marketing and advertising of Phone-Mate's product, acts as an agent for Phone-Mate. The rep arranges sales of Phone-Mate products to different accounts, and earns a 5% commission on sales to direct customers and 3% on sales to distributors such as Wren. Unlike the sales rep, the Phone-Mate distributor takes title to the company's products and resells them to direct accounts. The distributor is compensated by receiving the margin of profit between the price paid to Phone-Mate and the price charged to the customer. The distributor is not an agent of Phone-Mate. Phone-Mate alleges that its policy has been to use separate firms as sales reps for and distributors of its products.

In the context of this action, Wren acted as distributor for Phone-Mate in the New York regional sales market from 1974 through August 1983. The parties transacted business informally, without a written contract. Prior to May 1983, Phone-Mate had engaged companies unrelated to plaintiffs as sales reps for their merchandise. In early 1983, however, plaintiffs and defendant worked out a plan under which Wren would form a separate sales rep organization so that it could, in effect, function as both sales rep and distributor for Phone-Mate. That sales rep "arm" of Wren is the other plaintiff in this action, IMC.

---

**1.** *See infra* at 1579.

**2.** *See infra* note 8.

**3.** The descriptions of the functions of distributor and sales rep are not disputed by the parties, and are found in the Affidavit of Larry Kloman (Vice President of Sales, Phone-Mate) ("Kloman Aff.") ¶¶ 5–7.

As stated above, Phone-Mate had a policy of utilizing separate organizations to function as sales reps and distributors. Therefore, defendant alleges, the following factors were important to its decision to use Wren as both distributor and sales rep: (1) that Wren would form a separate sales rep organization to function as Phone-Mate's rep; (2) that this organization would be adequately staffed to perform the duties of a sales rep; and (3) that this separate organization would not function as sales rep for any companies that competed with Phone-Mate. Affidavit of Larry Kloman (Vice President of Sales, Phone-Mate) ("Kloman Aff.") ¶ 14. It was hoped by Wren and Phone-Mate that by using Wren as master distributor of Phone-Mate products in the New York area and using IMC as the sales rep, the overall market for Phone-Mate products would grow "because Wren/IMC would control both the marketing arm as sales rep and the supply side as distributor." Kloman Aff. ¶ 15.

As a result of negotiations between Wren and Phone-Mate, Wren developed an organizational chart for a separate sales rep organization, IMC, and conveyed to Phone-Mate assurances that IMC would be adequately staffed to meet Phone-Mate's sales rep needs. Phone-Mate appointed IMC as its sales rep effective May 1, 1983, by a contract which was memorialized in a written Sales Representative Agreement ("the Agreement") between those parties on June 3, 1983. Wren was not a party to the Agreement. The Agreement contained both an arbitration clause [4] and a provision for termination of the contract by either party on thirty days' written notice. Phone-Mate uses such Sales Representative Agreements when it contracts with sales reps throughout the country. Kloman Aff. ¶ 19.

IMC acted as Phone-Mate's sales rep until August 30, 1983, when Phone-Mate terminated the Agreement effective September 30, 1983. See Kloman Aff., Exh. D. Although the parties disagree as to how the distributor relationship between Wren and Phone-Mate was terminated,[5] it is clear that the distributorship arrangement ended on or about September 1983.

In November 1983, plaintiffs instituted this action against Phone-Mate, in which Wren alleges three claims for damages as follows: (1) damages due to excess inventory which defendant required Wren to purchase and which Wren could not sell due to the allegedly inferior quality of the goods; (2) defendant tortiously interfered with Wren's relationship with its customers by conveying various misrepresentations to those customers and by committing theft of Wren's customers; and (3) defendant refused to credit Wren for allegedly defective or unusable products returned to defendant by Wren.

Unlike Wren's claims against defendant, IMC's two claims against Phone-Mate refer specifically to the Sales Representative Agreement. IMC alleges (1) that defendant refused to pay IMC commissions due under the Agreement, and (2) defendant

---

**4.** The arbitration clause in the Sales Representative Agreement executed by IMC and Phone-Mate provided:

EIGHTH: All questions or controversies arising out of or in any respect relating to this Agreement shall be submitted to the American Arbitration Association at its office in the city of Los Angeles for determination, and the parties hereto agree to be bound by the award or decision made by the Arbitrator or Arbitrators designated by the American Arbitration Association and that a judgement [sic] consistent therewith may be entered in any court of competent jurisdiction.

**5.** Phone-Mate alleges that it informed Wren that it would be happy to continue to use Wren as its distributor even though its relationship with IMC was terminated, and that Wren voluntarily terminated the distributorship due to its displeasure over Phone-Mate's cancellation of the Agreement with IMC. See Kloman Aff. ¶ 22; Affidavit of John Kavazanjian (Eastern Regional Sales Manager for Phone-Mate) ("Kavazanjian Aff.") ¶ 19. Wren, however, contends that in addition to terminating its agreement with IMC, Phone-Mate wrongfully terminated its informal distributorship arrangement with Wren. See, e.g., Complaint ¶ 19; Affidavit of Leonard Rubin (Senior Vice President, Finance and Administration, of Wren; consultant to IMC) ("Rubin Aff."), ¶ 3 & n.*.

caused IMC to lose valuable business opportunities as a result of alleged misrepresentations by defendant and breach of the Agreement.

Defendant's instant motion to compel arbitration of the claims of both plaintiffs is based upon the existence of the arbitration clause in the IMC/Phone-Mate Sales Representative Agreement. *See supra* note 4. As mentioned above, IMC has consented to arbitrate its claims against Phone-Mate and to stay its claims in this Court pending the completion of that arbitration.

Phone-Mate also seeks, however, to compel Wren to arbitrate its claims despite the lack of any express agreement to arbitrate between those parties. Rather, Phone-Mate urges that Wren must be compelled to arbitrate because Wren is merely an "alter ego" of IMC and, as such, Wren must arbitrate its claims because IMC is compelled to do so. In support of this argument, Phone-Mate alleges that Wren and IMC were not separate organizations because: (1) the companies had their offices at the same location and used the same telephone number; (2) the three principals and the personnel of both companies were identical; (3) the Wren sales staff was never replaced by a separate IMC sales staff—i.e., only two full time IMC sales staff were ever hired; and (4) IMC was a wholly-owned subsidiary of Wren. Kloman Aff. ¶¶ 13, 15. Wren disputes Phone-Mate's contention, arguing that (1) Wren and IMC do not have a parent-subsidiary relationship;[6] (2) Wren and IMC carry out entirely different functions, i.e., distributor vs. sales representative; (3) IMC employed several "detail persons" who performed services solely for IMC, and hired approximately 100 persons from time to time to demonstrate Phone-Mate's products for IMC; and (4) IMC at all times maintained business records separate and distinct from those of Wren. Rubin Aff. ¶ 7.

For the reasons set forth below, I find defendant's argument that Wren must be compelled to arbitrate its claims based on the alter ego theory to be unpersuasive.

*Discussion*

### A. *Power to Compel Wren to Arbitrate*

 The power to compel arbitration arises under 9 U.S.C. § 4, which provides in part:

A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States District court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

It is settled law in this Circuit, however, that a court can compel a party to arbitrate a dispute even if that party did not enter into a written agreement containing an arbitration clause. This is so, for example, if the party sought to be compelled to arbitrate is merely the alter ego of a party that is clearly subject to arbitration. *See, e.g., McAllister Brothers, Inc. v. A & S Transportation Co.,* 621 F.2d 519 (2d Cir.1980) *("McAllister"); Interocean Shipping Co. v. National Shipping & Trading Corp.,* 523 F.2d 527, 539 (2d Cir.1975); *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). However, "absent findings of fraud or bad faith, a corporation ... is entitled to a presumption of separateness from a sister corporation ... even if both are owned and controlled by the same individuals." *American Renaissance Lines, Inc. v. Saxis Steamship Co.,* 502 F.2d 674, 677 (2d Cir.1974). In determining whether a party is bound by an

---

6. Rubin Aff. ¶ 7. Plaintiffs assert that Wren is wholly owned by Abraham Portnoy, its President and Chief Executive Officer, while IMC is wholly owned by Ronald Portnoy, who is the son of Abraham Portnoy. These allegations are concurred in by the affidavit of Ronald Portnoy. Plaintiffs do not dispute that Wren and IMC are related companies, however.

arbitration agreement, a federal court will look to state contract law principles. *McAllister, supra,* 621 F.2d at 524; *Farkar Co. v. R.A. Hanson DISC, Ltd.,* 441 F.Supp. 841, 845 (S.D.N.Y.1977), *affirmed as modified,* 583 F.2d 68 (2d Cir.1978), *modified on other grounds,* 604 F.2d 1 (2d Cir.1979) (decision on rehearing) (*"Farkar"*).

■ In support of its argument that Wren must arbitrate its claims against Phone-Mate, Phone-Mate relies most heavily upon *In the Matter of Sbarro Holding, Inc.,* 91 A.D.2d 613, 456 N.Y.S.2d 416 (2d Dep't 1982) (*"Sbarro"*) and the earlier two decisions in *Farkar, supra.* The facts of those cases differ substantially from those present in this action. Thus, even though "piercing of the corporate veil" in order to determine whether a corporation is the alter ego of another " 'is *sui generis* and must be evaluated on its own facts,' " *Farkar, supra,* 583 F.2d at 71 (quoting plaintiff's brief), those cases do not aid Phone-Mate's argument here.

In *Sbarro,* the court pierced the corporate veil of four related companies and compelled them all to arbitrate the plaintiffs' claims against one of them upon finding a "thorough integration of the entire Sbarro franchising operation." 456 N.Y. S.2d at 417. The court elaborated on the circumstances when one company will be compelled to arbitrate based on an alter ego theory:

> Where one corporation merely acts as the alter ego of a second corporation, the second corporation can be compelled to participate in an arbitration proceeding although it is not a signatory of the contract containing the arbitration clause which was, however, signed by the alter ego. . . .
> The corporate veil will be pierced (1) to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation

and act as the true prime movers behind the subsidiary's actions and/or (2) where a parent corporation conducts business through a subsidiary which exists solely to serve the parent. . . .

*Id.* (citations omitted). Unlike the intertwining contractual relationships of the parties in *Sbarro,* the only contract at issue here—the IMC/Phone-Mate Sales Representative Agreement—dealt strictly with the relationship between those two parties. For example, Phone-Mate has submitted no evidence that could establish that Wren and IMC were "thoroughly integrated" in a manner similar to the Sbarro companies.

In *Farkar,* the district court, applying Washington law, pierced the corporate veil after finding that one company was the "barest shell" of the other and that their identities were so confused and intermingled that third persons would probably be defrauded in dealing with either of the companies within the special theory of Washington law. In affirming the district court, the Circuit Court observed "that the corporate veil was so diaphanous that it did not even require piercing." 583 F.2d at 71. The Second Circuit, in other cases, has held that even if a corporation has "no mind of its own" and is completely dominated by a parent company, a showing of fraud or something akin to fraud "is a sine qua non to holding a non-signatory bound by an arbitration agreement." *Interocean Shipping Co. v. National Shipping & Trading Corp., supra,* 523 F.2d at 539 (citing *Fisser v. International Bank,* 282 F.2d 231, 238–40 (2d Cir.1960)).

The case of *McAllister Brothers, Inc. v. A & S Transportation Co., supra,* is also distinguishable from the instant case because the contract providing for arbitration in *McAllister* expressly bound the companies affiliated with the contract signatories. Here the only written agreement is between IMC and Phone-Mate and does not refer, by implication or otherwise, to Wren or any other party.[7]

---

7. The circuit court in *McAllister,* however, reversed and remanded the action insofar as the trial court had declined to compel arbitration by two companies allegedly affiliated with the signatories. The appellate court found that the plaintiff was entitled to a trial on the issue of whether the alleged affiliates were bound by the arbitration agreement. 621 F.2d at 524. Although Phone-Mate suggested in its reply memorandum that a trial be held on the issue of

The most apparent difference between the "alter ego cases" discussed above and the instant case, however, is the manner in which the related companies came into being. Assuming the validity of Phone-Mate's argument, based on *Sbarro, supra* at 1579–1580, that it is unnecessary to show fraud to compel a non-signatory to an agreement to arbitrate, the record here does not support the conclusions that "the officers and employees of a parent corporation ... [were acting] as the prime movers behind the subsidiary's actions" and/or there is a "subsidiary which exists solely to serve the parent." *Sbarro, supra,* 456 N.Y.S.2d at 417. Even if Phone-Mate had successfully established that IMC is a subsidiary of Wren, the plaintiffs' papers show that IMC had many different personnel and, in fact, an entirely different *function,* than that of Wren.

In addition, the record makes clear that it was Phone-Mate's instigation, more than Wren's desire, that caused Wren to establish IMC as a separate sales rep organization. In addition, in contrast to the *Sbarro* plaintiffs, who were bound to agreements drawn up by the person who served as officer, director and shareholder of the four related companies, it was Phone-Mate that prepared the Sales Representative Agreement here in issue. *See* Kloman Aff., Exh. C.

■ For the reasons set forth above, I find that Phone-Mate has not established that Wren and IMC are alter egos for the purpose of compelling Wren to arbitrate Wren's claims against defendant.

### B. *Power to Stay this Action*

■ The only issue remaining is whether Wren's claims in this action should be stayed pending the completion of the arbitration of IMC's claims against Phone-Mate. As authority for the argument that this action should be stayed, defendant cites 9 U.S.C. § 3 [8] as well as this Court's inherent equitable powers. Because § 3 expressly governs situations in which the court has found the claim to be referrable to arbitration pursuant to a written agreement, *see supra* note 8, that section cannot serve as a basis for staying Wren's claims here.

■ It is true, however, that the court may exercise its inherent equitable powers to stay Wren's claims pending resolution of the arbitration between IMC and Phone-Mate. *See, e.g., Landis v. North American Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936). There, the Supreme Court stated that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Id.* at 254, 57 S.Ct. at 166. In order to obtain the stay of an action pending arbitration, the party seeking the stay

> should demonstrate to the satisfaction of the court that they have not taken nor will take any steps to hamper the progress of the arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship.

*Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 442 (2d Cir.1964) (footnote omitted). *See also American Home Assurance Co. v. Vecco Concrete Construction Co.,* 629 F.2d 961, 964 (4th Cir.1980) (entire court action stayed where pending arbitration might resolve questions of fact common to lawsuit); *Home Life Insurance Co. v. Kaufman,*

whether Wren and IMC are alter egos, counsel for Phone-Mate conceded at oral argument of this motion that it could rely on its papers to support its motion to compel.

**8.** Section 3 of Title 9 provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, *the court* in which such suit is pending, *upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall* on application of one of the parties *stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

(emphasis added).

547 F.Supp. 833, 835–36 (S.D.N.Y.1982) (where defendant's active attempt to compel arbitration indicated defendant's expected effort to reach prompt disposition of dispute and arbitration of certain claims might clarify issues for court proceeding, entire action would be stayed). *See also Janmort Leasing Co. v. Econo-Car International, Inc.*, 475 F.Supp. 1282, 1293 (E.D.N.Y.1979); *Lawson Fabrics, Inc. v. Akzona, Inc.*, 355 F.Supp. 1146, 1151 (S.D. N.Y.), *aff'd*, 486 F.2d 1394 (2d Cir.1973). ██ The equities present in the above cited cases, however, do not compel this Court to stay Wren's claims for several reasons. First, as described *supra* at 1578–1579, Wren's claims differ substantially from those of IMC. In addition, Wren's alleged damages arise from its informal business arrangement with Phone-Mate, while IMC's claims are solely referable to the Sales Representative Agreement.

While both plaintiffs allege some form of tortious interference with business by Phone-Mate, nowhere do plaintiffs allege that their business losses are identical in nature.

For the above reasons, I find no justification for the exercise by this Court of its equitable powers to stay Wren's claims pending the resolution of the arbitration between IMC and Phone-Mate.[9]

*Conclusion*

For the reasons set forth above, defendant's motion to compel Wren to arbitrate or to stay Wren's claims pending the arbitration of IMC's claims against Phone-Mate is denied in its entirety.

SO ORDERED.

---

**9.** Even if this Court had determined that Wren should be compelled to arbitrate its claims against Phone-Mate, it is questionable whether this arbitration could be compelled to take place in Los Angeles, where the IMC arbitration will be conducted. This is so due to the venue restriction in 9 U.S.C. § 4, *supra* at 1579. *See, e.g., Couleur International Ltd. v. Saint-Tròpez*

*West,* 547 F.Supp. 176, 177–78 (S.D.N.Y.1982); *E.C. Ernst v. Potlatch Corp.*, 462 F.Supp. 694, 697 (S.D.N.Y.1978). Assuming that this Court has the power only to compel Wren to arbitrate within the venue of *this* district, judicial economy would not be served at all if IMC arbitrates its claims in Los Angeles while Wren arbitrates its claims here.