In re Petitions of Jukka LAITASALO and Ossi Sokka, as Joint Administrators of Kansa General International Insurance Company Ltd. and Kansa Reinsurance Company Ltd., Debtors in Foreign Proceedings.

Bankruptcy Nos. 95–B–40385 (JHG), 95–B–40386 (JHG).

United States Bankruptcy Court, S.D. New York.

June 20, 1996.

As Corrected July 30, 1996.

Mound, Cotton & Wollan, New York City by Michael H. Goldstein, for Continental Casualty Company.

Gilbert Segall and Young LLP, New York City by H. Barry Vasios, for the Joint Administrators of Kansa General International Insurance Company Ltd. and Kansa Reinsurance Company Ltd.

### DECISION ON MOTION TO COMPEL ARBITRATION

JEFFRY H. GALLET, Bankruptcy Judge.

#### I. Introduction

Continental Casualty Company ("Continental") moves to compel Kansa General International Insurance Company Ltd. ("Kansa General") to participate in the arbitration proceeding between Continental and Kansa Reinsurance Company Ltd. ("Kansa Re") (the "Arbitration").[1] Continental also seeks

---

1. My April 5, 1995 Order granted Kansa Reinsurance Company, Ltd. and Kansa General International Insurance Company Ltd. a limited preliminary injunction and allowed certain litigation

to enjoin Kansa General from further prosecution of an action against Continental and Kansa Re in the Helsinki, Finland District Court (the "Helsinki Suit").

The dispute between the parties concerns a letter of credit ("LOC") posted in the Arbitration by Kansa General, which provides for its draw down on approval of the arbitration panel. The issue before me is whether the arbitrators have jurisdiction over Kansa General to order the draw down.

Continental argues that the dispute is within the province of the current arbitration proceedings between Continental and Kansa Re, because (1) Kansa General is the alter ego of Kansa Re; (2) Kansa General agreed to participate in the Arbitration proceeding by its conduct; (3) Kansa General's conduct creates a quasi-contract to arbitrate with Continental; and (4) all the matters relating to the letter of credit fall within the jurisdiction of the arbitrators. It reasons that, since the arbitrators have jurisdiction of the issue, Kansa General should be enjoined from proceeding against Continental in Finland.

Kansa General opposes the motion. It denies Continental's allegations and argues that: (1) the LOC, intended to be issued by Kansa Re to secure its obligation to Continental, contained a term making it impossible to draw upon; (2) the LOC, which was mistakenly obtained from Kansa General, does not submit Kansa General to the jurisdiction of the Arbitration Panel in Kansa Re's arbitration with Continental; (3) this Court lacks subject matter jurisdiction to grant the relief sought by Continental; and (4) arbitration requires consent of the parties and Kansa General never agreed to arbitrate any issue regarding any matter pertaining to the LOC.

### A. Bankruptcy Proceedings

On December 30, 1994, liquidation proceedings were commenced in the Helsinki District Court of the Republic of Finland by both Kansa Re and Kansa General (the "Kansa Companies") under the Finnish Bankruptcy Code. On the same day, the

Helsinki District Court adjudged them bankrupt and appointed Magnus Pousette, Tom Schubert and Jukka Laitasalo as the joint interim receivers.

On January 27, 1995, ancillary petitions pursuant to section 304 of the United States Bankruptcy Code were filed before me. On January 30, 1995, I ordered the joint administration of the two Kansa cases.

In February of 1995, the Kansa Companies filed a motion for a preliminary injunction. Several parties opposed the motion, including parties holding letters of credit and setoff agreements, parties involved in litigations and arbitrations against the debtors, and several State Insurance Commissioners.

On February 16, 1995, I granted the ancillary petitions under 11 U.S.C. § 304 and entered a temporary restraining order. I found that I had jurisdiction under section 304(a), *In re Koreag Controle et Revision S.A.,* 130 B.R. 705, 711 (Bankr.S.D.N.Y.1991) *vacated and remanded on other grounds,* 961 F.2d 341 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992), and that the petitioners met the venue requirements of 28 U.S.C. § 1410(c), *In re Evans,* 177 B.R. 193 (Bankr.S.D.N.Y.1995). I held that the foreign representatives could sue in this Court for injunctive or turnover relief concerning a litigation or property. *Id.*

On March 17, 1995, Jukka Laitasalo and Ossi Sokka where appointed joint permanent administrators ("Administrators" or "Petitioners").[2] On March 20, 1995, they submitted a written status report to me for the two cases.

On April 3, 1995, I held a hearing on their motion for a preliminary injunction. That day, after considerable negotiations among the parties, all parties in attendance, except Mutual Fire, Marine & Inland Insurance Company ("Mutual Fire") and Integrity Insurance Company in Liquidation ("Integrity") agreed to an order granting certain in-

and arbitration proceedings to go forward, including the arbitration of a dispute between Continental and Kansa Reinsurance Company, Ltd.

2. The joint permanent administrators were substituted for the joint interim receivers.

junctive relief.[3] Continental was among the parties who consented to the order. In part, Continental agreed to the order because it was agreed that the LOCs posted by the Kansa Companies would remain in place to be drawn upon in the ordinary course of business and because their pending arbitrations could continue in the United States.

As part of the April 5, 1995 agreement, Continental, Columbia Casualty Company ("Columbia") and other member companies of the CNA Insurance Group,[4] entered into a stipulation, dated April 3, 1995, with Kansa Re and Kansa General, which allowed Continental and Columbia to continue certain arbitration proceedings. On the eve of the April 3, 1995 hearing, the parties discovered that there were questions about the LOC posted in the Arbitration. Therefore, by their April 3, 1995 stipulation, they each reserved their rights to the contested LOC.

On June 22, 1995, Kansa General commenced the Helsinki Suit. In the Helsinki Suit, Kansa General seeks return of the LOC. In response, Continental filed this motion.

### B. Background

Continental and Kansa Re are engaged in an arbitration proceeding concerning various disputes arising under certain reinsurance agreements between them. These disputes arise out of Kansa Re's participation, from November 1, 1983 through June 30, 1988, in a number of Directors and Officers Liability Reinsurance Agreements (the "Agreements") by which Kansa Re reinsured certain Continental obligations. The Agreements, renewed yearly, contained arbitration provisions, which provide, in pertinent part:

As a condition precedent to any right of action hereunder, any dispute arising out of this Agreement shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire, meeting in Chicago, Illinois, unless otherwise agreed. *Directors' and Officers' Lia-*

*bility Second Excess Cession Reinsurance Agreement* at Art. 21 (July 1, 1987).

In 1993, following a dispute between Continental and Kansa Re, and after an arbitration demand was made, the arbitrators ordered Kansa Re to post a LOC as security for a possible award. On or about May 11, 1993, in response to the Arbitration Panel's direction, Kansa General sent Continental a LOC in the amount of $3,470,244. In December 1993, Kansa General amended the LOC, at the direction of the panel, to change certain language. In August 1994, Kansa General increased the value of the LOC by $1,043,810, bringing the total value in favor of Continental to $4,514,054. On August 3, 1995, the Arbitrators awarded Continental $5,607,866 plus interest of $1,079,559. The arbitrators left the Arbitration open as to whether they have jurisdiction to determine questions relating to the LOC.

The dispute about the LOC revolves around two issues: (1) it was posted by Kansa General, a non-party to the Arbitration, rather than Kansa Re, which is a party; and (2) it contains a payment term providing that it may be drawn upon "[i]f and only if it is accompanied by what purports to be an award [5] of the arbitration panel in the matter of the arbitration *between Continental Casualty Company and Kansa General Insurance Company Ltd....*" (Emphasis added)

### II. Law

#### A. Modification of the April 5, 1995 Order

Continental moves for a modification of my April 5, 1995 Order, pursuant to 11 U.S.C. § 105(a), compelling Kansa General to arbitrate. *In re Johns–Manville Corp.*, 801 F.2d 60 (2d Cir.1986). Section 105(a) gives me the authority to modify my prior orders. *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir.1990) (noting circumstances where modification of an order is appropriate); *In re Banco Nacional de Obras y Servicios Publi-*

---

**3.** Integrity ultimately agreed to the injunction. An injunction, on essentially the same terms, was later granted against Mutual Fire. *In re Laitasalo*, 193 B.R. 187 (Bankr.S.D.N.Y.1996).

**4.** Continental and Columbia are both member companies of the CNA Insurance Group.

**5.** The word "award" was subsequently amended to read "approval."

*cos, S.N.C.,* 91 B.R. 661 (Bankr.S.D.N.Y. 1988) ("[I]t may be necessary after a 304 case is filed and relief granted to tinker with the relief to do justice in particular circumstances.").

In January 1995, and again in September 1995, the Kansa Companies argued that I had jurisdiction over the bankruptcy petitions, and I agreed.[6] Pursuant to 11 U.S.C. § 304(b) I have authority to enforce broad relief in these proceedings. *In re Brierley,* 145 B.R. 151 (Bankr.S.D.N.Y.1992), *In re Gee,* 53 B.R. 891, 899 (Bankr.S.D.N.Y.1985).

In considering whether I should modify my April 5, 1995 Order to compel Kansa General to arbitrate about the LOC, I must determine (1) the scope of the arbitration clause and (2) whether Kansa General, a non-signatory, should be a party to the Arbitration to determine issues concerning the disputed LOC.

*1. Arbitrator's scope*

■ An arbitration panel gains its authority and scope from the essence of the contract. *Yasuda Fire & Marine Ins. Co. of Europe Ltd. v. Continental Casualty Co.,* 37 F.3d 345, 351 (7th Cir.1994). "[W]hen parties agree to submit disputes to arbitration, it is presumed that the arbitrator will be authorized to determine all issues of law and fact necessary to resolve the dispute." *ATSA of California, Inc. v. Continental Ins. Co.,* 702 F.2d 172, 174–175 (9th Cir.1983), *amended,* 754 F.2d 1394 (9th Cir.1985). "Arbitration clauses are to be liberally construed, and any doubts about the scope of an arbitration clause are to be resolved in favor of arbitration." *Id.; Ormsbee Dev. Co. v. Grace,* 668 F.2d 1140 (10th Cir.1982), *cert. denied, sub nom., Grace v. Santa Fe Pacific R.R. Co.,* 459 U.S. 838, 103 S.Ct. 84, 74 L.Ed.2d 79 (1982).

■ Disputes regarding which issues are to be arbitrated must be decided by the courts. The Supreme Court, in *First Options of Chicago, Inc.,* —— U.S. ——, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), held that if "the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration ..." *Id.* at ——, 115 S.Ct. at 1924; *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). The Second Circuit has held that a court, and not the arbitrator, must determine whether a non-signatory is subject to an arbitration agreement. *Orion Shipping and Trading Co., v. Eastern States Petroleum Corp. of Panama,* 312 F.2d 299, 300 (2d Cir.), *cert. denied,* 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705 (1963).

■ The arbitration agreement between Kansa Re and Continental is broad, including "any dispute arising out of this Agreement...." In 1993, the Arbitrators ordered Kansa Re to post a LOC for Continental's security. Continental and the Arbitrators relied on the LOC being posted, and, as a result, the arbitration proceeding continued. "To this extent the arbitration panel acted consistently with the agreement in an even broader sense: to protect the bargain giving rise to the dispute." *Yasuda Fire & Marine Ins. Co.,* 37 F.3d at 351. Kansa General has recognized the panel's subject matter jurisdiction over the LOC by three times following its direction as to the LOC in question.

The arbitration agreement itself, does not speak to the jurisdiction of the Arbitrators over Kansa General. Therefore, the question of whether Kansa General should be compelled to arbitrate the LOC controversy is properly before me.

*2. Binding a non-signatory to an arbitration agreement*

■ Under certain circumstances, a court can compel a party to arbitrate a dispute, even if that party did not enter into an arbitration agreement. The law in the Second Circuit is that a non-signatory to an arbitration agreement can be compelled to arbitrate "if so dictated by the 'ordinary principles of contract and agency[,]'" under

---

**6.** I recently reaffirmed my jurisdiction over these petitions in *In re Laitasalo,* 193 B.R. 187 (Bankr. S.D.N.Y.1996), pursuant to 11 U.S.C. § 304 and 28 U.S.C. § 1410(c).

five theories: "1) incorporation by reference; 2) assumption [implied conduct]; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995); *Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100 (2d Cir.), *cert. denied,* 502 U.S. 910, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991); *Farkar Co. v. R.A. Hanson Disc, Ltd.,* 583 F.2d 68, 70 (2d Cir.1978); *In re Keystone Shipping Co. and Texport Oil Company,* 782 F.Supp. 28, 30–31 (S.D.N.Y.1992); *In re Transrol Navegacao S.A.,* 782 F.Supp. 848, 851 (S.D.N.Y.1991); *Wren Distrib., Inc. v. Phone Mate, Inc.,* 600 F.Supp. 1576, 1579 (E.D.N.Y. 1985). This motion raises questions of alter ego, implied conduct, and estoppel.

### a. Alter Ego

Both Parties [7] assert, in part, that

[b]ecause New York Courts disregard the corporate form reluctantly, they do so only when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation ..., and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir. 1990), *rev'd on other grounds,* 982 F.2d 765 (2d Cir.1992) (*quoting, Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979)); *Farkar Co.,* 583 F.2d 68, 70 (2d Cir.1978) (a finding of fraud was not necessary where the domination was overwhelming); *Interocean Shipping Co., v. National Shipping and Trading Corp.,* 523 F.2d 527, 539 (2d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Wren Distributors, Inc. v. Phone Mate, Inc.,* 600 F.Supp. 1576, 1579–80 (E.D.N.Y.1985) (*citing, In the Matter of Sbarro Holding, Inc.,* 91 A.D.2d 613, 456 N.Y.S.2d 416 (2d Dep't.1982)) (a finding of

fraud may not be needed); *cf., In re Keystone Shipping Co. and Texport Oil,* 782 F.Supp. 28, 30 (Court held that a lone allegation of mere affiliation was not enough to pierce the corporate veil. Moreover, " 'absent findings of fraud or bad faith, a corporation ... is entitled to a presumption of separateness from a sister corporation ... even if both are controlled by the same individuals.' ").

The Court of Appeals in *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 139 (2d Cir.1991) suggested the examination of the following factors to determine whether a corporation is an alter ego of another:

(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather then corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id.* (citations omitted); *Thomson–CSF, S.A.,* 64 F.3d at 777–78.

### b. Implied Conduct to Arbitrate

In *Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100 (2d Cir.), *cert. denied,* 502 U.S.

---

7. Kansa, in its brief, addressed the standard for alter ego under the New York law briefed by Continental. However, it states, in a footnote, that the issue may be governed by Finnish law since the Kansa Companies were incorporated in Finland. *Kalb, Voorhis & Co. v. American Financial Corp.,* 8 F.3d 130, 132 (2d Cir.1993). Kansa did not brief the alter ego theory under Finnish

law. It purports to reserve its right to brief the issue if I find I have subject matter jurisdiction to decide this motion. Kansa never received my consent to that position and I do not give it now. In any event my decision does not turn on whether Continental proved the alter ego theory, I need not decide that issue.

910, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991), the Court of Appeals held that an agreement to arbitrate may be implied by conduct. The *Gvozdenovic* Court, found that, although certain union members were not signatories to the arbitration agreement, there was an agreement to arbitrate based on the parties' conduct and participation in the arbitration. *Id.* at 1105. It further held that the union members' conduct manifested a clear "intent to arbitrate the dispute. The record demonstrates their active and voluntary participation in the arbitration[.]" *Id.* The Court noted the union members' actions, which supported their participation in the arbitration, including: "cho[osing] a committee to represent them in the arbitration," which "on their behalf, ... withdrew funds from the bank account set up to cover its expenses, chose counsel to represent the [union members] in the arbitration and argued vigorously that they should receive full credit for their time of employment with [their previous employer]." *Id.* The Court also noted that there was no "evidence that, at any point before or during the arbitration, the appellants objected to the process, refused to arbitrate or made any attempt to seek judicial relief." *Id.*

The District Court, in *In re Transrol Navegacao S.A.*, 782 F.Supp. 848 (S.D.N.Y. 1991), also held that a non-signator can be compelled to arbitrate based on its implied conduct in the arbitration proceeding. The Court in *Transrol*, relying on *Gvozdenovic*, found, "[a]t a minimum, *Gvozdenovic* stands for the proposition that when an agreement to arbitrate may be implied from conduct of a non-signator, that non-signator may not later assert the invalidity of the arbitral award based on its non-signatory status." *Id.* at 851. In addition, the Court in *Transrol* held that "where parties intend to arbitrate, it is

not unjust to expect them to arbitrate, and where, in their conduct, they manifest that intent to their opposing party who relies on that manifestation of intent, and proceeds to dispute resolution through arbitration, it is unjust to discredit the arbitration." *Id.* at 851. The Court found that the non-signator's conduct in a French Court, where it asserted that the proceeding could not continue due to the arbitration agreement, along with all the relevant evidence, did not undercut the arbitration award and that Transol, the non-signatory, was bound. *Id.* at 852; *Thomson–CSF, S.A.*, 64 F.3d at 777.

Based on the holdings of the cases cited above, an argument can be made that if I find that Kansa General's conduct implied an agreement to arbitrate with Continental, then that conduct also created a quasi or constructive contract [8] between Kansa General and Continental to arbitrate the issue regarding the LOC.

### c. Estoppel

■ Consideration of the doctrine of estoppel is appropriate here. Under the estoppel doctrine recognized in this Circuit, a Court may estop a non-signatory, who knowingly exploits an agreement with an arbitration provision, from avoiding arbitration. *Thomson–CSF, S.A.*, 64 F.3d at 778. In *Thomson–CSF, S.A.*, the non-signatory had notice of the agreement with the arbitration clause before it purchased one of the signator parties. The *Thomson–CSF, S.A.* Court found that the non-signator did not benefit from, nor attempt to enforce the agreement, and therefore, the party was not bound by the agreement. *Id.* at 778–79.

The Court in *Thomson–CSF, S.A.*, follows the decision in *Deloitte Noraudit A/S v.*

---

**8.** Both Parties cite to the following, at least in part, as the definition of a quasi or constructive contract:

A quasi or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In truth, it is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such

circumstance that in equity and good conscience he ought not to retain it, and which ex aequo et bono belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it. It is fictitiously deemed contractual, in order to fit the cause of action to the contractual remedy. *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337 (1916); *see also, New York Tel. Co. v. Teichner*, 69 Misc.2d 135, 329 N.Y.S.2d 689, 691 (1972).

*Sells, U.S.,* 9 F.3d 1060 (2d Cir.1993), which also applies the estoppel theory. In *Deloitte Noraudit A/S,* a foreign accounting firm, not a signatory to the arbitration agreement, was compelled to arbitrate under an estoppel theory because it had knowledge of the contract, benefitted from the use of the name "Deloitte," which was regulated by the contract and did not object to the terms of the contract. *Id.* at 1065.

The Court of Appeals, in *Thomson–CSF, S.A.,* recognized that the Fourth and Eleventh Circuits allow an alternative equitable estoppel theory in order to require arbitration between a signatory and a non-signatory. *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757–58 (11th Cir. 1993), *cert. denied, sub nom., Sunkist Growers Inc. v. Del Monte Corp.,* —— U.S. ——, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., Inc.,* 741 F.2d 342, 344 (11th Cir.1984). These cases hold that courts may estop a signatory from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in the arbitration are intertwined with an agreement that the estopped party has signed.

### B. Enjoining Litigants in a Foreign Proceeding

Federal Courts have the power to enjoin litigants subject to their jurisdiction from proceeding with an action in a foreign jurisdiction. However, this power is "used sparingly" and "should only be granted 'with care and great restraint.'" *China Trade & Development Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35–36 (2d Cir.1987) (citations omitted).

The *China Trade* Court, cites this District's test in *American Home Assur. Corp. v. Insurance Corp. of Ireland, Ltd.,* 603 F.Supp. 636, 643 (S.D.N.Y.1984), for anti-foreign-suit injunctions. The two threshold requirements for such an injunction include: (1) "[the] [p]arties must be the same in both matters, and [2] resolution of the first action must be dispositive of the action to be enjoined." *Id.* The District Court held that once these threshold requirements are met, five factors should be considered in determining whether the foreign action should be enjoined: "(1) frustration of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice other equitable considerations; or (5) adjudication of the same issue in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment." *Id.*

The Court in *China Trade,* 837 F.2d at 35–36, emphasized the importance of two of the five factors that should be considered under the test in *American Home Corp.* The Court of Appeals held "[h]aving due regard to the interests of comity," the Court must consider: "(A) whether the foreign action threatens the jurisdiction of the enjoining forum and (B) whether strong public policies of the enjoining forum are threatened by the foreign action." *Id.* at 36.

The Court of Appeals in *China Trade,* also clarified its interpretation of the standard in *American Home Corp.* holding that "concurrent jurisdiction in two courts does not necessarily result in a conflict[,]" and that in parallel proceedings, where both courts have in personam jurisdiction, they should proceed simultaneously, "at least until a judgment is reached in one that can be plead res judicata in the other." *China Trade,* 837 F.2d at 36. The Court further held that it is not enough to show that the foreign suit is "vexatious," or that there is a "race to judgment" causing "additional expense" or that a party is ". . . seeking 'slight advantages in the substantive or procedural law to be applied in a foreign court.'" *Id.* at 36–37 (citation omitted).

### III. Discussion

Several facts are uncontested. Kansa Re and Kansa General are related companies and are subsidiaries of Kansa International Corporation Ltd. ("KIC"). Kansa General is a 39.2% shareholder of Kansa Re and the remaining 60.08% of Kansa Re's shares are owned by KIC which owns 100% of Kansa General. The Kansa Companies had the

same Board of Directors, were managed by the same staff and officers, and had the same address. Neither company had its own employees and each paid KIC to perform its administrative functions. The Kansa Companies filed bankruptcy on the same day and hour; employed the same attorneys[9] and joint administrators in connection with the Finnish and U.S. bankruptcy proceedings and pending U.S. arbitrations; used the same counsel, auditor, and witness in U.S. arbitrations[10] between Kansa Re and Continental and between Kansa General and Columbia Casualty Company; filed similar post-bankruptcy reports; and, prior to the bankruptcy filing, the same individuals resigned as directors and managing directors of each company.

Continental also made several allegations, which Kansa disputes. These allegations include: that the Kansa Companies commingled funds, did not distinguish between companies in their communications and that the culmination of Kansa General's control over Kansa Re was the posting of the disputed LOC. The evidence submitted to support these allegations is strong. In support of commingled funds allegation, Continental cites to Kansa General posting the disputed LOC, amending it on two separate occasions, the joint administrators' memoranda dated March 17, 1995,[11] and the Special Audit Reports of Kansa General, dated February 26, 1996, and Kansa Re, dated January 31, 1996, prepared by the Finnish office of Tuokko Deloitte & Touche Oy. The joint administrators' memoranda states, in pertinent part:

> The Companies' assets primarily consist of receivables from other group companies of Kansa, and are stated in the estate inventory at their nominal value without value depreciation.

According to information received by the interim administrators. Kansa corporation had already in the 1970s introduced a personal account system under which the mutual debt and credit relationships of the group companies had been adjusted on a monthly basis, and especially by means of equalization arrangements in conjunction with the financial statements. Receivables had been adjusted in the accounts by means of such equalizations for instance so that a subsidiary's receivable from another group subsidiary was under the equalization practice stated as a receivable from the parent company of the group.

It has not been possible for the interim administrators to estimate the juridical nature of the personal account system and the relating accounting equalizations. Neither has it been possible during the phase of interim administration of the bankrupt's estate to start releasing these equalizations. Receivables from and payables to other group companies have in the inventory been stated in the same way as in the company's accounts. *Administrators' Memorandum Kansa General International Insurance Company*, at 3 (Mar. 17, 1995).

In 1996, after the joint administrators' memoranda was filed, a special audit was conducted. The audit report discusses the intra company transfers which appear to have been made for convenience and liquidity purposes of the Kansa Group.[12] The report, states:

---

9. Indeed, the same attorneys represent the Administrators for both Kansa Re and Kansa General on this motion.

10. Kansa Re and Kansa General are both involved in arbitration proceedings with the CNA Insurance Group, which includes Continental and Columbia Casualty Company. It is uncontested that at the time the LOC was issued and amended for the arbitration proceedings both Kansa Companies were represented by LeBoeuf, Lamb, Greene & MacRae. Kansa's counsel stated on the record that LeBoeuf, Lamb, Greene & MacRae drafted the LOC in favor of Continental. *Transcript of Hearing*, at 23—24 (Sept. 13, 1995).

11. Two memoranda by the joint interim administrators dated March 17, 1995, were submitted as exhibits to the motion. There is a memorandum for Kansa General and a memorandum for Kansa Re. The memoranda are similar, but not identical. There are certain paragraphs that are either identical or very similar in both memoranda.

12. The Kansa Group includes the following related companies: Kansa General, Kansa Re, Kansa Life Insurance Company Ltd., Kansa Pension Insurance Company Ltd., and Kansa International Corporation, Ltd.

The group companies of Kansa Companies used in their accounting an intra-group account, or so-called personal account, through which the internal money transactions, as well as intra-group receivables and payables were booked ...

Money payments to external creditors were paid for liquidity reasons and other similar reasons from bank accounts which had sufficient coverage regardless of whether the bank account belonged to the paying company or some other group company. Similarly, a received payment could be left on the recipient's bank account, even if it belonged to another group company. Such use was declared in the accounts by booking the same amount on the personal account establishing a payable-receivable relationship between the company which had used the money and the company to which the money belonged. This had been an established practice. *Report of special audit Kansa Reinsurance Company* at 43 (Jan. 31, 1996).

The Kansa General Report records analogous findings. *Report of special audit Kansa General International Insurance Company,* at 62–3 (Feb. 26, 1996). The audit reports also shows the transfers of substantial sums between Kansa General to Kansa Re for reasons of, at least, liquidity. *Report of special audit Kansa Reinsurance Company* at 43 (Jan. 31, 1996). The Kansa Re report states that: "[a] major part of the insurance claims paid by Kansa Reinsurance were paid from Kansa General International's account through Kanre and the claims paid by Kansa General International to Kansa Reinsurance under the reinsurance agreements were booked through Kanre as receivables from Kansa General International." [13] *Id.* at 49; *Report of special audit Kansa General International Insurance Company* at 68 (Feb. 26, 1996).

Continental also asserts that in the period before the bankruptcy proceedings, the representatives of the Kansa Companies did not distinguish between the two Kansa Companies in their communications with Continen-

tal and Columbia Casualty Company regarding the arbitration proceedings between Kansa Re and Continental and between Kansa General and Columbia. Continental supports this statement with two of its own internal memoranda and two letters concerning the LOC. In these four communications, none of the parties distinguish between the Kansa Companies, including Kansa's counsel and the arbitrators. *Letter from Pete Beresford to CNA Insurance Companies file,* (Jan. 3, 1993); *Id.* (Oct. 9, 1991); *Letter from John Andrews to Geoffry Best and Michael Goldstein,* (July 20, 1993); *Letter from Geoffry Best to John Andrews, Ralph Hemp, and Roy Hammond,* (July 23, 1993). The letters dated in July 1993, both concern the disputed LOC. The first letter is from the arbitration panel regarding the need to amend the LOC so that a draw-down could occur on its "approval," rather then by an "award" by the arbitration panel. *Letter from John Andrews to Geoffry Best and Michael Goldstein,* (July 20, 1993). The second letter is from Kansa's attorney, acknowledging the arbitration panel's concerns and Kansa's understanding that,

> ... the purpose of the letter of credit is to secure Continental throughout the entire length of this arbitration proceeding and assures the panel that, during the pendency of this arbitration (up to and including the panel's final award), it will not decline to renew the letter of credit prior to expiration. *Letter from Geoffry Best to John Andrews, Ralph Hemp, and Roy Hammond,* (July 23, 1993).

This letter also only refers to "Kansa" and not Kansa Re or Kansa General.

The same lawyer appeared for each Kansa company in the arbitration proceedings before the panel. It is well established that a lawyer appearing for a client in a litigation binds the client as an agent binding his principal. *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.,* 32 F.2d 195, 198 (2d Cir.), *cert. denied,* 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629 (1929). Here, the lawyer/agent submits Kansa General and its LOC to the

---

**13.** "Kanre was used to follow up and book the claims paid as well as the insurance premiums received and reinsurance claims assumed." *Report of special audit Kansa General International Insurance Company,* at 68 (Feb. 26, 1996).

jurisdiction of the arbitrators. The arbitrators, and Continental, with good cause, relied on Kansa General's lawyer.

Kansa responds that the LOC was not intentionally posted by Kansa General and that neither the paragraphs cited from the Joint Administrators' memoranda dated March 17, 1995 nor the Special Audit reports prove commingled funds between Kansa General or Kansa Re. Kansa in the *Affidavit of Mikko Mannonen,* (Aug. 1, 1995),[14] asserts that the personal accounting system ("PAS"), referred to above, was established to facilitate financial transactions among the companies within the Kansa Group. Mikko Mannonen asserts in his affidavit that,

> ... the PAS was monitored and maintained precisely to provide for the *separate* accounting for the assets and liabilities of the Kansa Group companies on an intercompany basis. It was designed to insure that the financial integrity of the companies was respected by the application of proper accounting principles for intercompany balances. The Finnish Ministry of Social Affairs and Health, which regulates Finnish insurance companies, was aware of PAS. *Id.* at 4.

Kansa further disputes the allegations that Kansa General was the alter ego of Kansa Re in the Mannonen affidavit, where he states,

> ... Kansa General and Kansa Re were always separate corporate entitles duly incorporated under the laws of the Republic of Finland, separately licensed by and subject to the regulatory authority of the Ministry of Social Affairs and Health of Finland. Kansa General and Kansa Re maintained separate books of account, had separate assets and liabilities, and had separate books of assumed reinsurance and, in case of Kansa General, direct insurance business. Kansa General and Kansa Re entered into separate contracts of reinsurance and retrocession pursuant to which they obtained protection for their

respective books of insurance and assumed reinsurance. *Id.* at 3.

## IV. Decision

█ Under any one of the theories to compel a non-signatory to arbitrate an agreement, Kansa General could be compelled to arbitrate. Its sophisticated counsel submitted the LOC to the Arbitrators. The Kansa Companies intended to arbitrate the disputes under the reinsurance agreements with Continental and the consent order of April 5. The dispute regarding the LOC, therefore, should be arbitrated.

Kansa General should be compelled to arbitrate the dispute regarding the LOC for several reasons:

First, Kansa General actually posted the LOC in 1993, for $3,470,244. Kansa General amended the LOC twice, one amendment increased it by $1,043,810. This could not have been just a "mistake" as Kansa General contends. Kansa General has sophisticated attorneys and an intricate intra-company accounting system. Either Kansa General intended to post the LOC or it did not matter which company actually posted the LOC because the companies acted for each other.[15]

Second, the Kansa Companies are, at the very least, closely related companies that regularly transferred funds to each other, shared staff, officers, directors and attorneys.

Third, once the LOC was posted, Continental relied to its detriment on that security, did not pursue other legal remedies, and allowed the Arbitration to continue.

Fourth, Kansa Re and Continental each intended the disputes that arose under the reinsurance agreements would be arbitrated. Kansa General's posting of the LOC manifested its intent that the disputes under the reinsurance agreement with Continental should be resolved by arbitration. Kansa General, as part owner of Kansa Re, and KIC, as the parent of both Kansa Companies, were aware of the arbitration provi-

**14.** Mikko Mannonen is a legal consultant to the Kansa Companies.

**15.** Kansa General strains credibility by arguing, in essence, that Kansa General simply overlooked the issuance of an LOC of more than $4.5 million and the posting of security to collateralize it.

sions, intended that the arbitration provisions be enforced. They cannot now avoid that agreement by trying to revoke the LOC.

The Kansa Companies received the benefit of their bargain to have this dispute resolved in a private forum. It would be unjust to allow these related companies to avoid the arbitration agreement having litigated under it to the end, and lost.

Under each of the theories discussed, alter ego, implied conduct, quasi contract and estoppel I can reasonably find that Kansa General should be compelled to arbitrate the issue of the disputed LOC. On this motion, the facts support each of these theories.

Only Kansa General knows the full truth.[16] However, there appears to be no reasonable interpretation of the facts to support Kansa General's position that the LOC is not subject to the arbitrators' jurisdiction.

 Estoppel is the strongest argument. The Court of Appeals held that under an estoppel theory a non-signator can be compelled to arbitrate a dispute where the contract had an arbitration provision, the non-signatory had knowledge of the contract, benefitted from the contract and did not object to the terms of the contract. *Thomson–CSF, S.A.*, 64 F.3d at 778. Each of these conditions were met here.

 Additionally, I find that, under an equitable estoppel theory, Kansa General should be compelled to arbitrate the issue of the disputed LOC. Under equitable estoppel, I must find "that the party alleged to be estopped '(1) [engaged in] conduct which amounts to a false representation or concealment of material facts; (2) inten[ded] that such conduct [would] be acted upon by the other party; and (3) [knew] the real facts.'" (citations omitted) "In addition, the party alleging estoppel must also 'show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position.'" (citations omitted). *Readco, Inc., v. Marine Midland Bank*, 81 F.3d 295, 301–02 (2d Cir.1996). Based on the

facts of this case, I find that this standard has also been met.

Implied conduct also supports compelling Kansa General to arbitrate. This District held that, "where parties intend to arbitrate, it is not unjust to expect them to arbitrate, and where, in their conduct, they manifest that intent to their opposing party who relies on the that manifestation of intent, and proceeds to dispute resolution through arbitration, it is unjust to discredit the arbitration." *Transrol*, 782 F.Supp. at 851. Once Kansa General caused the LOC to be sent to Continental, allowed the Arbitration to continue and caused Continental to rely on the LOC, Kansa General manifested its intent to participate in the Arbitration. Accordingly, based on its conduct, it would be unjust not to compel Kansa General to arbitrate.

A quasi or constructive contract, under the definition cited above by each party, was formed here. Kansa argues that the doctrine of quasi contract does not apply because it is a restitutionary device designed to prevent unjust enrichment. If Kansa General is not compelled to arbitrate, Kansa General will be unjustly enriched because it will be able to withdraw the LOC and recover its collateral.

In addition, Kansa General as part owner of Kansa Re, is enriched when Kansa Re is enriched. Kansa Re benefitted by being able to continue the Arbitration, without Continental exercising its other legal remedies, based on LOC, which Kansa General now wants to withdraw once Kansa Re lost.

In this Circuit, in order to find that the Kansa Companies were alter egos, I need only find that Kansa Re was either so dominated by Kansa General and its separate identity disregarded or that Kansa General used Kansa Re to achieve fraud. *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d at 703; *In re Farkar*, 583 F.2d at 70; *Interocean Shipping Co.*, 523 F.2d at 539; *Wren Distributors, Inc.*, 600 F.Supp. at 1579–80. Both are possible under the facts cited above, which were manifested by Kansa General posting, collateralizing and amending the LOC. Kansa General and Kansa Re

---

**16.** For example, only Kansa can know why it posted the LOC.

seem to fit the test in *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139. Only Kansa General knows why it posted the LOC in this Arbitration. All the plausible reasons support the alter ego theory.

Since, Kansa General must arbitrate under estoppel, implied conduct and quasi contract theories, I need not make a finding of alter ego, although the facts would support one.

 Continental argues that I should enjoin Kansa from prosecuting the Helsinki Suit. The weight of the evidence favors enjoining Kansa General from continuing that action. The Kansa Companies were granted a limited preliminary injunction, on Continental's consent, because they agreed to allow certain litigations and arbitrations to proceed in the U.S. The Kansa Companies specifically agreed to proceed with the Arbitration between Kansa Re and Continental here and not in Finland. Since, I now find that Kansa General is bound by that arbitration agreement, Kansa General must arbitrate this dispute in the U.S. and not litigate it in Finland, as agreed in my April 5, 1995 Order. Indeed, Congress intended that debtors in foreign proceedings be bound by bilateral orders entered on their consent and orders flowing from those agreements. 11 U.S.C. §§ 304, 306.[17]

This Court has an extraordinary critical interest in assuring the representations made before it be honored. Under the controlling law in this Circuit and District, as enumerated in *China Trade*, 837 F.2d at 36–37 and *American Home Insurance Corp.*, 603 F.Supp. at 643, there is cause to enjoin Kansa from prosecuting the Helsinki Suit: (1) Kansa General, Kansa Re and Continental are all named in both suits; (2) the resolution of the case before either the Finnish Court or this Court would be dispositive of the other action; (3) Kansa consented to this Court's jurisdiction and agreed to proceed with the Arbitration, upon which Continental relied and withdrew its objection to the injunction; and (4) adjudication of the same issues in separate actions could result in

delay, inconvenience, expense, inconsistency, or a race to judgment.

The parties must submit this dispute to arbitration. Since Kansa agreed to allow this Arbitration to continue as part of my April 5, 1995 Order, I must enjoin Kansa from prosecuting the Helsinki suit in order to prevent injustice and vexation.

## V. Conclusion

Accordingly, Kansa General shall arbitrate all issues regarding the LOC as part of the Arbitration. Kansa shall be enjoined, from proceeding with the Helsinki Suit.

Settle Order.

---

**17.** § 306. Limited Appearance. An appearance in a bankruptcy court by a foreign representative in connection with a petition or request under section 303, 304, or 305 of this title does not submit such foreign representative to the jurisdiction of any court in the United States for any

other purpose, but the bankruptcy court may condition any order under section 303, 304, or 305 of this title on compliance by such foreign representative with the orders of such bankruptcy court.